Lauren M. Rule (ISB #6863)
ADVOCATES FOR THE WEST
3115 NE Sandy Blvd., Suite 223
Portland, OR 97232
(503) 914-6388
lrule@advocateswest.org

Jason C. Rylander (DCB #474995)
DEFENDERS OF WILDLIFE
1130 17th Street, NW
Washington, DC 20036
(202) 772-3245
jrylander@defenders.org

Attorneys for Plaintiffs


## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, <br> DEFENDERS OF WILDLIFE, <br> CONSERVATION NORTHWEST <br> IDAHO CONSERVATION LEAGUE <br> SELKIRK CONSERVATION ALLIANCE, <br> and THE LANDS COUNCIL; <br><br>     Plaintiffs, <br><br> v. <br><br> BRIAN KELLY, U.S. Fish and Wildlife <br> Service Idaho State Supervisor, and <br> U.S. FISH AND WILDLIFE SERVICE; <br><br>     Defendants. | No. <br><br><br><br> **COMPLAINT** |

## INTRODUCTION

1.      Plaintiffs Center for Biological Diversity, Defenders of Wildlife, Conservation

Northwest, Idaho Conservation League, Selkirk Conservation Alliance, and The Lands Council

challenge Defendant U.S. Fish and Wildlife Service's ("the Service") final critical habitat

designation for the endangered southern Selkirk Mountains population of woodland caribou. After proposing to designate more than 375,000 acres of critical habitat in northern Idaho and northeastern Washington, the Service designated only 30,010 acres in its final critical habitat rule. As detailed below, this final designation violates the Endangered Species Act ("ESA") and the Administrative Procedure Act ("APA").

2.      Although woodland caribou is one of the most endangered mammals in the United States, the Service designated less than 10% of the area it first determined should be critical habitat and which it had previously identified as necessary for recovery in its woodland caribou recovery plan. The Service did not adequately explain how the final designation satisfied the ESA's requirement to designate all areas that are essential to recover the species, or why areas it originally determined were essential were no longer necessary to recover the southern Selkirk Mountains woodland caribou population.

3.      Agency documents show that after spending considerable time reviewing and assessing comments from the public and four peer reviewers on its proposed rule, the Service still determined that most of the area it had originally proposed designating was essential to the conservation of the species, as described in a draft final rule. But after this draft final rule was sent to Washington D.C. for final approval, suddenly the Service decided to significantly reduce the designation, and quickly revised its draft final rule to exclude large geographic areas from the final designation.

4.      The hurriedly completed final rule violates the ESA and APA in numerous ways. Specifically, the Service: (1) failed to designate habitat essential to the conservation of the woodland caribou; (2) failed to adequately consider unoccupied habitat that may be essential for recovery of this extremely endangered population; (3) significantly reduced the amount of

critical habitat from what was considered necessary in the proposed designation without adequately explaining and demonstrating how the final designation complies with the requirements of the ESA; (4) failed to reasonably explain why it had reinterpreted what it considered occupied habitat; (5) failed to rely on the best available science; and (6) failed to provide notice and comment on the substantially revised critical habitat designation before issuing the final rule.

5.      In light of these violations of law, Plaintiffs ask the Court to set aside the final critical habitat designation for the southern Selkirk Mountains population of woodland caribou and order the Service to complete a new critical habitat rule that complies with the law.

## JURISDICTION AND VENUE

6.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the ESA, 16 U.S.C. § 1531 et seq.; the APA, 5 U.S.C. § 701 et seq.; the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.; and the Equal Access to Justice Act, 28 U.S.C. § 2214 et seq. An actual, justiciable controversy now exists between Plaintiffs and Defendants, and the requested relief is therefore proper under 5 U.S.C. §§ 701-06; 28 U.S.C. §§ 2201-02; and 16 U.S.C. § 1540(g).

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and 16 U.S.C. § 1540(g)(3)(A) because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, Defendants and Plaintiffs Idaho Conservation League and Selkirk Conservation Alliance reside in this district, and a substantial part of the public lands and resources in question are located within this district.

8.      As required by the ESA, Plaintiffs provided 60 days' notice of their intent to bring this action.

9.      The Federal Government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702 and 16 U.S.C. § 1540(g)(1).

**PARTIES**

10.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("Center") is a non-profit corporation dedicated to the preservation, protection, and restoration of biodiversity, native species, ecosystems, and public lands throughout the United States, including the West. The Center has more than 48,000 members, and is based in Tucson, Arizona with offices in Alaska, California, Florida, Minnesota, New Mexico, Oregon, Vermont, Washington, and the District of Columbia. The Center and its staff and individual members have an interest in ensuring the conservation and recovery of the woodland caribou, and have participated in many relevant activities and agency proceedings to further that interest.

11.     Plaintiff DEFENDERS OF WILDLIFE ("Defenders") is a national non-profit conservation organization, incorporated under the laws of the District of Columbia. Defenders has more than 430,000 members nationwide, including more than 14,500 in Washington and Idaho, and is headquartered in Washington, D.C. Defenders' mission is to protect all native wild animals and plants in their natural communities. Defenders has developed programs for combating species extinction, the loss of biological diversity, and habitat alteration and destruction. Defenders has long been involved in seeking to promote the protection and recovery of the woodland caribou in the United States as well as Canada; and has participated in agency proceedings relevant to the woodland caribou.

12.     Plaintiff CONSERVATION NORTHWEST ("CNW") is a Washington non-profit conservation organization with more than 8,000 members, dedicated to maintaining the ecological integrity of the Pacific Northwest's wildlands. CNW's principle office is in

Bellingham, Washington. CNW and its staff and members seek to protect the forests of the Northwest, as well as endangered and threatened species that inhabit those forests, by integrating science, advocacy, public policy, outreach, and litigation. CNW has long been involved in seeking to promote the protection and recovery of the woodland caribou in the United States and Canada; and has participated in numerous agency proceedings to further that interest.

13.     Plaintiff IDAHO CONSERVATION LEAGUE ("ICL") is an Idaho non-profit membership organization with more than 3,000 members, which is dedicated to protecting and conserving Idaho's waters, wildlands, and wildlife. ICL is based in Boise, Idaho. ICL seeks to protect Idaho's natural resources through citizen action, public outreach, education, advocacy, and litigation, among other efforts. ICL, as an organization and on behalf of its staff and members, is greatly concerned with and active in seeking to protect and improve wildlife and wildlife habitat in Idaho, including the woodland caribou of the Selkirk Mountains ecosystem.

14.     Plaintiff SELKIRK CONSERVATION ALLIANCE ("SCA") is a non-profit membership organization dedicated to the protection, restoration, and wise use and enjoyment of the Selkirk Mountains ecosystem of northern Idaho and northeastern Washington. SCA, with its principle office in Priest River, Idaho, has more than 400 members who live primarily in northern Idaho and eastern Washington. SCA seeks to protect the natural resources of the Selkirk ecosystem through participation in agency proceedings, public outreach and education, advocacy, and litigation. SCA, as an organization and on behalf of its staff and members, is greatly concerned with and active in seeking to protect and improve wildlife and wildlife habitat, including woodland caribou in the Selkirk Mountains ecosystem.

15.     Plaintiff THE LANDS COUNCIL ("TLC") is a Washington non-profit membership organization dedicated to protecting and conserving the natural resources and

quality of life of the Inland Pacific Northwest. TLC's principle office is located in Spokane, Washington. TLC, as an organization and on behalf of its staff and members, has been extensively involved in seeking to promote sound land management practices, including protection and recovery of the Selkirk Mountains woodland caribou.

16.     Plaintiffs, both organizationally and on behalf of their staff, members, and supporters, have deep and long-standing interests in the preservation, protection, and recovery of the southern Selkirk Mountains woodland caribou. Plaintiffs have participated in many agency proceedings to protect and recover this population of woodland caribou, including the petition and court action that resulted in Defendants' critical habitat designation challenged herein. Plaintiffs' interests in protecting and recovering woodland caribou are directly harmed by the challenged critical habitat designation for the southern Selkirk Mountains population of woodland caribou.

17.     Plaintiffs' staff, members, and supporters frequently use and enjoy the lands, fish and wildlife and other natural resources in the Selkirk Mountains of northern Idaho and northeast Washington. Plaintiffs' staff, members, and supporters seek to observe, photograph, and enjoy native wildlife, including woodland caribou, during their recreational and professional activities in the Selkirk Mountains of northern Idaho and northeast Washington. Plaintiffs' staff, members, and supporters derive—or, but for the endangered status of the woodland caribou, would derive—recreational, scientific, aesthetic, spiritual and/or commercial benefits from the existence in the wild of woodland caribou through observation, appreciation, study, photography, and other pursuits. The interests of Plaintiffs and their members and supporters have been, are being, and will continue to be injured by Defendants' violation of law.

18.     Plaintiffs' staff, members, and supporters plan to continue to regularly visit and use the lands in the Selkirk Mountains of northern Idaho and northeast Washington for recreational and professional pursuits in the future. Plaintiffs' and their members' and supporters' aesthetic, conservation, recreational, scientific and other interests in the preservation, protection, and recovery of the woodland caribou are being directly harmed by Defendants' action challenged herein. Plaintiffs' above-described interests have been, are being, and unless the relief prayed for is granted, will continue to be adversely affected and irreparably injured by Defendants' violations of law. Plaintiffs have no adequate remedy at law, and thus the requested relief is appropriate.

19.     Defendant BRIAN KELLY is an employee of the U.S. Fish and Wildlife Service, who currently serves as the Idaho State Supervisor, based in Boise, Idaho. As the Idaho State Supervisor, Defendant Kelly is responsible for administering the provisions of the ESA in the State of Idaho and issuing the Final Designation of Critical Habitat for the Southern Selkirk Mountains Population of Woodland Caribou. Defendant Kelly is sued only in his official capacity.

20.     Defendant U.S. FISH AND WILDLIFE SERVICE ("Service") is an agency or instrumentality of the United States, and is responsible for administering the provisions of the ESA with regard to threatened and endangered terrestrial and freshwater aquatic species, including the endangered southern Selkirk Mountains population of woodland caribou. The Idaho State Office of the Service, based in Boise, Idaho, issued the critical habitat designation challenged herein.

### ENDANGERED SPECIES ACT

21.     The ESA was enacted to "provide a means whereby the ecosystems upon which

endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such [] species." 16 U.S.C. § 1532(b).

22.     Under the ESA, the Secretary of the Interior or Commerce ("the Secretary") lists a species as endangered if it is "in danger of extinction throughout all or a significant portion of its range," or as threatened if it is "likely to become an endangered species within the foreseeable future." 16 U.S.C. §§ 1533(a)(1), 1532(6) & (20).

23.     Concurrently with listing a species as threatened or endangered, the Secretary also must designate the species' "critical habitat" to the maximum extent prudent and determinable. 16 U.S.C. § 1533(a)(3)(A)(i).

24.     The ESA defines critical habitat as: (1) the specific areas within the geographical area occupied by the species at the time it was listed on which are found those physical and biological features essential to the conservation of the species and which may require special management considerations or protection; and (2) specific areas outside the geographical area occupied by the species at the time it was listed that the Service determines are essential for the conservation of the species. *Id*. § 1532(5).

25.     "Conservation" means "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary"—i.e. the species is recovered. *Id*. §1532(3).

26.     ESA regulations state that when determining critical habitat, the Service shall consider those physical and biological features that are essential to the conservation of a species and that may require special management considerations or protection, where such requirements include: (1) space for individual and population growth, and for normal behavior; (2) food,

water, air, light, minerals, or other nutritional or physiological requirements; (3) cover or shelter; (4) sites for breeding, reproduction, rearing of offspring, germination, or seed dispersal; and (5) habitats that are protected from disturbance or are representative of the historic geographical and ecological distributions of a species. 50 C.F.R. § 424.12(b).

27.     In its critical habitat determination, the Service must focus on the principal biological or physical constituent elements within the defined area that are essential to the conservation of the species and must list the known primary constituent elements with the critical habitat description. *Id.*

28.     A critical habitat designation must be based on the best scientific data available and must take into consideration the economic impact, and any other relevant impact, of specifying any particular area as critical habitat. 16 U.S.C. § 1533(b)(2). The Service may exclude any area from critical habitat if it determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless it determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned. *Id.*

29.     When issuing rules under the ESA, including critical habitat rules, the Service must comply with the requirements of section 553 of the Administrative Procedure Act. 16 U.S.C. § 1533(b)(4). These requirements include providing public notice and opportunity for comment on proposed rules. 5 U.S.C. § 553(b)-(c).

## STATEMENT OF FACTS

**A.      Southern Selkirk Mountains Woodland Caribou**

30.     Woodland caribou historically occupied much of Canada and the northern tier of the United States, including areas in New England, the Great Lakes states, and the Pacific

Northwest. Woodland caribou are no longer found in New England or the Great Lakes area.

31.     Woodland caribou consist of three ecotypes: boreal caribou, northern caribou, and mountain caribou. The southern Selkirk Mountains population is part of the mountain caribou ecotype.

32.     Mountain caribou require large contiguous areas of high-elevation old growth coniferous forests with little or no disturbance from vehicles or other human activities. The primary threats to mountain caribou are habitat loss or fragmentation such as from timber harvest or wildfire, disturbances that displace caribou from their habitat such as snowmobile use in winter or off-road vehicle use in summer, and predation.

33.     One of the primary ways caribou avoid predators is to spread out at low densities and in areas with few other ungulates, meaning they require large expanses of undisturbed habitat to support this evolutionary technique of predator avoidance.

34.     These animals make movements between seasonal habitat types. In winter, they go up to high elevation ridgetops that have old-growth subalpine fir and Engelmann spruce forests and walk on top of the compacted snow to access arboreal lichens, which is their primary food source in winter.

35.     In spring, the animals move to lower elevations where snow has melted to forage on new green vegetation. In summer months, the caribou move back to mid and upper elevation forests to forage on forbs, grasses, and other plants, often using riparian areas where vegetation is lush. Pregnant females seek out high-elevation areas in early summer for calving to avoid predators, and subsist primarily on arboreal lichen because green forage is not yet available in these secluded high-elevation habitats.

36.     In early winter, the animals move back down in elevation to old-growth western

hemlock/red cedar forests. These forests often have higher canopy cover that intercepts early snow and leaves ground vegetation accessible before the snows at higher elevations have consolidated enough for the animals to walk on top and reach the arboreal lichen. The Southern Selkirk Mountains population of caribou will use early winter habitat down to or even below 4,000 feet in elevation depending on the habitat type and winter snow conditions in specific locations.

37.    These caribou also must have corridors or transition zones that connect their seasonal habitats.

38.    Mountain caribou currently inhabit mountainous terrain in eastern British Columbia and the Selkirk Mountains of northern Idaho and northeast Washington. The southern Selkirk Mountains population is the southernmost population of mountain caribou, and the last remaining mountain caribou population in the United States. Most of the mountain caribou populations have declined in size and range and consist of less than 100 individuals. The southern Selkirk population is particularly endangered and at risk of extirpation.

39.    Mountain caribou are listed as threatened under Canada's Species at Risk Act. The population shared with the U.S. in the southern Selkirk Mountains that is the subject of this complaint is recognized as being the population most seriously at risk.

40.    Historically, this population ranged as far south as the Salmon River in Idaho and east to Montana. As recently as the 1950's, the population occupied habitat down to the St. Joe River in Idaho and consisted of at least 100 animals. Since then, it has declined significantly, however, and fluctuated between about 30 and 50 animals over the past thirty years. Currently the population is at the lower end of that range.

41.    Because this population is separated by 30 to 60 miles from the next closest

mountain caribou populations, individuals from other populations rarely immigrate to the southern Selkirk population to provide genetic diversity, increasing the risk of inbreeding.

42.     Due to the extremely imperiled status of the southern Selkirk Mountains population, this population was emergency listed as endangered under the ESA on January 14, 1983 (48 Fed. Reg. 1722) and a final listing rule was published on February 29, 1984 (49 Fed. Reg. 7390). At the time it was listed, only an estimated 25-30 animals existed in the population and thus it was considered one of the most critically endangered mammals in the United States. The listing rules stated that 100 animals were considered to be a viable population.

43.     After the southern Selkirk Mountains population was listed as endangered, the Service completed a recovery plan for the population in 1985 and then revised it in 1994. This plan contained an objective to maintain an increasing population and stated that for recovery, woodland caribou in the Selkirks must be distributed over a wider area than at present. It delineated a Recovery Area of roughly 443,000 acres, of which approximately 53% occurred within the United States and 47% within British Columbia. The recovery plan emphasized the need to protect this habitat, concluding:

> Conservation of caribou habitat is vital to the recovery of the Selkirk caribou. Caribou in the Selkirks use specific seasonal habitats (Stevenson and Hatler 1985, Serveen and Scott 1985, Rominger and Oldemeyer 1989, Serveen and Lyon 1989, Simpson and Woods 1987, Antifeau 1987). Conservation of these habitats and their juxtaposition is an important element of caribou recovery.

*Recovery Plan For Woodland Caribou In The Selkirk Mountains* pp. 30-31 (1994).

44.     Later Recovery Action Plans for the southern Selkirk Mountains woodland caribou written by the Woodland Caribou Recovery Team set a goal of 125 animals for this population. The current population is still far below that goal.

**B.**      **Critical Habitat Designation for Southern Selkirk Mountains Caribou Population**

**1.**      **Proposed Rule**

45.      The Service did not designate critical habitat for the southern Selkirk Mountains population of woodland caribou at the time it listed the species as endangered. Instead, it determined such a designation was not prudent because it would increase the danger of illegal hunting and poaching by identifying the critical habitat of this species.

46.      In 2002, a coalition of environmental groups petitioned the Service to designate critical habitat for the endangered southern Selkirk Mountains caribou. After seven years passed with no action on their petition, the coalition sued the Service in 2009. A settlement of that lawsuit resulted in a proposed critical habitat rule being issued on November 30, 2011 (76 Fed. Reg. 74,018) and a final rule on November 28, 2012 (77 Fed. Reg. 71,042).

47.      The proposed rule designated 375,562 acres while the final rule designated only 30,010 acres, a reduction of more than 93 percent.

48.      The proposed rule determined that it was now prudent to designate critical habitat because the threat of illegal poaching of caribou was much less than it was at the time of listing and stated that the objective of the critical habitat designation was to provide for the recovery of the southern Selkirk Mountains population of woodland caribou.

49.      The proposed rule noted that this population of caribou occurs in steep, mountainous terrain generally above 4,000 feet in elevation, and that its current range extends approximately 484 miles from the north end of the Hart Ranges in British Columbia to the south end of the Selkirk Mountains in Idaho and Washington. It also noted that historically woodland caribou have ranged as far south as the St. Joe River and Elk City near the Clearwater River and also near the city of St. Maries in Idaho. The population is now the southernmost extant

population of mountain caribou and the last remaining mountain caribou population in the United States; and it is currently considered at risk of extirpation.

50.     The proposed rule explained that woodland caribou do not aggregate into large herds but, rather, spread out at low densities—30-50 caribou/250,000 acres—as a predator avoidance tactic, and this strategy is the dominant factor that determines the natural density of caribou populations. Thus, these animals need large contiguous areas of high-elevation forest with little or no vehicle access and disturbance so they can spread out at low densities.

51.     When describing the recovery plan for this population, the proposed rule noted that part of the recovery strategy was to secure and manage at least 443,000 acres of suitable and potential habitat in the Selkirks to support a self-sustaining population. The proposed rule quoted the plan's statement that for recovery, woodland caribou in the Selkirks must be distributed over a wider area than they occupied at that time.

52.     The proposed rule discussed efforts to augment the population, observing that these efforts had led to a "modest increase (average of 7 percent) in population over the last 5 to 10 years," (76 Fed. Reg. 74,020), but also noting that they had not resulted in a "long-term improvement in caribou distribution throughout the recovery area" perhaps because recent augmentation efforts had coincided with a time of high mountain lion densities (76 Fed. Reg. 74,022).

53.     The proposed rule acknowledged that "the number of caribou in Idaho has dwindled, and the bulk of the population primarily occupy habitat in the B.C. portion of the recovery area, although there is continued movement back and forth across the B.C. and U.S. border." *Id.*

54.     The proposed rule also discussed the 2008 five-year status review for the southern

Selkirk Mountains caribou population, noting that this review determined the recovery plan for the caribou did not "reflect best available and most up to date information on the biology of the species and its habitat" because a great deal of information had been collected since 1994 on "caribou and their habitat, the effects of threats such as habitat fragmentation, predation and human access, and various options and approaches for recovery efforts" (76 Fed. Reg. 74,022).

55.     However, the proposed rule still noted that the recovery plan establishes the actions and conservation objectives needed to recover this population of caribou, and that the proposed critical habitat designation will support those objectives by designating the areas essential to the conservation of the species.

56.     Based on the seasonal habitat needs of woodland caribou described above, the Service identified the necessary physical and biological features essential to caribou recovery as the following: suitable, large contiguous areas of habitat that allow caribou to spread out at low densities, avoid predators, and obtain sufficient winter forage of lichens; arboreal hair lichen that occur on mature to old-growth trees; large contiguous areas of high-elevation, old-growth forest ridgetops, which are likely to be predator limited, and have sufficient forage of lichens to support a pregnant cow; and large contiguous areas of old-growth or mature forests, at high-elevation (4,000 feet or greater) and transitional areas that connect habitats essential to meet the life history requirements of caribou and have little to no disturbance from vehicles or other forest activities.

57.     The primary constituent elements that are the specific compositional elements of the physical and biological features essential to the conservation of the species were described in the proposed rule as: (i) mature to old-growth western hemlock/western red cedar climax forest and subalpine fir/Engelmann spruce climax forest over 4,000 feet in elevation and 70% or greater canopy closure; (ii) ridge tops with deep snowpack that are generally 6,000 feet in

elevation or higher, in mature or old stands of subalpine fir/Engelmann spruce climax forest with relatively open 50% canopy; (iii) arboreal hair lichen in high enough amounts to support caribou herds; (iv) high-elevation benches and shallow slopes, secondary stream bottoms, riparian areas and seeps, and subalpine meadows with succulent forbs, grasses, flowering plants, and other vegetation; and (v) transition zones that connect the habitats described above and that facilitate seasonal caribou movements between habitat types.

58.    The areas designated as critical habitat in the proposed rule "generally follow the recovery areas identified in the recovery plan" with a number of refinements based on more current information (76 Fed. Reg. 74,027). The Service began by mapping the areas described in the 1984 final listing rule as occupied by caribou and delineating areas over 4,000 feet in elevation using a digital elevation model, which the Service stated corresponded to the elevation above which woodland caribou are generally known to occur.

59.    Next, the Service overlayed seasonal telemetry data for this population collected from 1987 through 2004, the Recovery Area boundaries, caribou movement corridors, and the results of the seasonal habitat suitability model by Kinley and Apps (2007) to refine the proposed critical habitat boundaries.

60.    Finally, the Service removed isolated patches, areas that lacked primary constituent elements, and areas that had relatively low historical utilization based on telemetry data, and added some areas below 4,000 feet in elevation where seasonal connectivity between habitats was required, to create the final critical habitat map.

61.    The Service intended the designation to include areas identified as occupied in the final listing rule, that are representative of the distribution of this population's seasonal habitat needs with the goal of maintaining the species' range of habitat, that provide the essential

physical or biological features necessary to support the species' life-history requirements under varying environmental conditions, and that provide connectivity between habitats to provide for seasonal movement and genetic variability

62.     The result of this analysis delineated 375,562 acres of critical habitat in Idaho and Washington, with 294,947 acres on Federal land, 65,236 acres on State of Idaho land, and 15,379 acres on private land. The Service determined that these areas were both "occupied at the time of listing," *and* contained "all of the physical or biological features essential to the conservation of the southern Selkirk Mountains caribou population." (76 Fed. Reg. 74029).

63.     The Service also considered whether unoccupied areas were necessary to ensure the conservation of the species, but determined they were not based on the expansive description of occupied habitat in the proposed listing rule, which was deemed sufficient to recover the species.

64.     The Service gave sixty days for the public to submit comments on the proposed rule, and also stated that it would seek out at least three specialists to peer review the proposed rule and give their expert opinions.

**2.     Draft Final Rule**

65.     After publication of the proposed rule on November 30, 2011, the Service spent roughly eight months assessing public comments, peer reviews, and other information to draft the final critical habitat rule.

66.     The Service received hundreds of written public comments from individuals, organizations, counties, the State of Idaho, the State of Washington, the Kootenai and Kalispell Tribes, and others. It also received written comments from four peer reviewers. Further, it held several public hearings in Idaho where the public could provide verbal comments on the

proposed rule.

67.     The four peer review comments varied in substance. One peer reviewer, Canadian caribou biologist Leo DeGroot, simply stated that he found the proposed rule very thorough and accurate and had no comments. Other peer reviewers questioned the claim that the entire area proposed for critical habitat was occupied at the time of listing, but made statements supporting designation of large blocks of habitat and suggested refinements to better identify suitable habitat. None of the reviewers suggested reducing critical habitat to just those areas currently utilized by the highly endangered caribou.

68.     Retired caribou biologist Greg Servheen specifically noted the need for large and contiguous areas containing all seasonal habitats that are connected. He also noted the need for more discussion on motorized access and human disturbance in caribou habitat and impacts from predators. Mr. Servheen did not suggest any change to the 4,000-foot elevation cut-off for critical habitat, and provided cites to additional scientific articles the Service should consider. Mr. Servheen did state that the area "occupied" by caribou at the time of listing was smaller than what the Service described in the proposed rule based on surveys he did in 1983-85, but also specifically agreed that the proposed critical habitat "incorporates those physical and biological characteristics necessary for caribou and their recovery."

69.     Peer review comments by Wayne Wakkinen, senior wildlife research biologist with Idaho Department of Fish and Game, included several points. Mr. Wakkinen pointed out that survey data from 1983-85 did not support the claim that all areas proposed as critical habitat were "occupied" by caribou at the time of listing. He also stated that telemetry data showed caribou mostly use areas above 5,000 feet in elevation. He suggested using the 2007 Kinley and Apps habitat modeling to refine the proposed critical habitat designation, and adding travel

corridors between areas of high quality habitat using the 2010 Wakkinen and Sloan travel corridor modeling analysis. Finally, he provided a few comments to refine the description of seasonal habitats used by caribou.

70.     Lydia Allen, the Forest Wildlife Biologist for the Idaho Panhandle National Forest, provided the most extensive peer review comments on the proposed critical habitat rule. Ms. Allen provided some comments and clarifications for the description of seasonal caribou habitats and noted the importance of including travel corridors to connect quality habitats within the United States and between the United States and Canada. With regard to the elevation cut-off for critical habitat, Ms. Allen discussed findings from a number of studies on caribou habitat use and recommended 4,500 feet as the appropriate elevation to identify critical early winter habitat, which she noted is consistent with the designation of much of the recovery zone.

71.     Ms. Allen recommended including more information on impacts from human disturbance and predation and refining the discussion on impacts from timber harvest and wildfire. Ms. Allen stated that she believed the proposed rule identified sufficient habitat to provide for the conservation of caribou, but like other reviewers noted that this entire area was likely not "occupied" at the time of listing based on studies from 1972-73 and 1982-85. Finally, she recommended using the Kinley and Apps 2007 habitat modeling analysis and recent forest maps on vegetation characteristics to identify suitable habitat within the Recovery Area for finalizing the critical habitat designation.

72.     Although the peer reviewers did not believe that the entire proposed critical habitat area was occupied at the time of listing, none of the peer reviewers stated that this smaller "occupied" area was adequate to ensure the conservation of the species.

73.     Biologists within the Service's local offices in Spokane and Boise worked

extensively on assessing the peer review and public comments and additional science, adjusting the critical habitat designation, and drafting a final rule; and also coordinated with biologists in the Regional Office.

74. To assist in the process of determining final critical habitat, Service biologists evaluated a variety of critical habitat "alternatives" based on comments by the Kootenai Tribe, Idaho Department of Fish and Game, Idaho Department of Lands and peer reviewers Wakkinen and Allen, the proposed critical habitat rule, the Recovery Area, and three new alternatives developed by the Service.

75. Each of the alternatives included the entire crest of the Selkirk Mountains in Idaho and the Shedroof Divide in Washington but varied in the amount of additional habitat protected. The alternative based on comments by peer reviewer Wakkinen would designate 228,009 acres of critical habitat while the alternative based on comments from peer reviewer Allen would designate 297,944 acres. The Kootenai Tribe alternative, Idaho Department of Lands alternative, and Idaho Fish and Game alternative were 182,670 acres, 162,887 acres and 86,806 acres respectively. The three new alternatives developed by the Service consisted of 217,964 acres, 227,051 acres, and 244,308 acres of critical habitat.

76. After considering these alternatives, the Service's Idaho State Office completed a draft final rule that selected its alternative of 227,100 acres of critical habitat for the final designation, and sent it to the Regional Office for preliminary review near the end of July 2012. The draft final rule explained that the Service reviewed and evaluated all comments and information provided to it, as well as many scientific articles, surveys and studies, and expert opinions, and used that information to inform the final rule. Based on this information, the Service adjusted the final rule to refine the descriptions of the primary constituent elements and

seasonal habitats for caribou. The Service also incorporated the Wakkinen and Sloane (2010) movement corridor analysis into the draft final designation.

77.     The reduction of acres in the selected alternative from what the proposed rule designated reflected a change in the elevation cut-off for critical habitat from 4,000 feet to 5,000 feet. This change was based primarily on the Kinley and Apps (2007) telemetry analysis and habitat modeling, as well as peer review and public comments and other information received in response to the proposed rule.

78.     The Kinley and Apps analysis depicted high priority caribou habitat throughout the Selkirk Mountains in Idaho. It showed most habitat at above 5,000 feet in elevation, but indicated caribou use of habitat down to and below 4,000 feet in elevation in certain areas. The Service did not determine the importance of these lower elevation areas to caribou recovery before dismissing them in the draft final rule.

79.     The draft final rule continued to consider all of the designated area as occupied by caribou at the time of listing based on various reports documenting caribou sightings throughout the Selkirk Mountains prior to and up to the time of listing. It noted the limitations of the 1983-85 study that the peer reviewers cited and stated that the historical and contemporaneous caribou observations on which it was relying was the most relevant information for determining occupancy.

80.     The draft final rule concluded that the area being designated was essential for the conservation of the species due to its suitable habitat conditions, proximity to similar habitat in Canada, and location at the southernmost extent of the species' range. Furthermore, even if the entire area was not occupied at the time of listing, the Service stated that its determination that the areas were essential to the conservation of the species *would still apply*.

81.     After the Regional Office reviewed the draft final rule, it was sent to the Washington Office for review on August 31, 2012, still designating 227,100 acres of critical habitat.

### 3.     Final Critical Habitat Designation

82.     In early September, the Service suddenly decided to significantly reduce the critical habitat designation. It substantially reduced the amount of habitat it considered occupied and then determined not to include any habitat that was now considered unoccupied. Thus, the new recommendation eliminated all critical habitat in Idaho except a small area near the borders of Washington and Canada, resulting in just 30,010 acres of critical habitat compared to the 375,000+ acres originally proposed. The new recommendation would occur on federal land only, with no critical habitat on state or private land.

83.     The Service spent a few weeks searching for documents to justify its new decision and reworking the final critical habitat rule. In mid-October, it sent a revised final rule to the Washington Office for review.

84.     The final critical habitat designation of 30,010 acres was published in the Federal Register on November 28, 2012. The final designation included 23,980 acres in Washington and 6,029 acres in Idaho, all on federal land, compared to 71,976 acres in Washington and 303,568 acres in Idaho in the proposed designation, which included federal, state, and private land in Idaho. The Service included only habitat above 5,000 feet in the final designation. The Service did not allow for public comment on the substantially reduced version of the critical habitat designation before issuing the final rule.

85.     Despite significantly reducing the amount of habitat considered occupied at the time of listing, the Service did not designate any unoccupied habitat in its final rule. Thus, the

Service excluded from the final designation most of the area it had determined was essential to the conservation of the species in the proposed rule and the draft final rule as well as in the Recovery Plan.

86.     The Service failed to explain how the habitat it did designate would lead to the recovery of the species. Specifically, the final rule failed to describe what a recovered southern Selkirk Mountains population of woodland caribou would be in terms of population size or geographic distribution. It failed to explain or provide any support for the proposition that the small amount of occupied habitat supporting just 20-30 animals was adequate to ensure the recovery of the population and that designation of unoccupied habitat was not necessary.

87.     Nowhere did the Service explain how the southern Selkirk Mountains population of caribou could recover without increasing its population and expanding its current distribution into unoccupied habitat. It simply stated that because the population had declined and its southern range had contracted, the unoccupied habitat was not essential to the conservation of the species.

88.     The Service's final designation was not supported by the best available science, including the opinions of its own biologists that much more area was essential for the conservation of the species, the 2007 Kinley and Apps habitat analysis showing high priority habitat throughout the Selkirk Mountains, the peer review comments, the Recovery Area designated in the Recovery Plan, and recent observations of caribou using habitat in the southern part of the Selkirk Mountains. The Service stated that it was not considering anecdotal observations of caribou farther south in Idaho in recent years because they were not reliable despite that some of those observations were verified by biologists and had been accepted as evidence in federal court.

89.     The Service changed its interpretation of occupied habitat at the time of listing by basing it solely on the 1983-85 study despite its biologists' lengthy explanation in the draft final rule rejecting that interpretation. Nowhere did the Service explain why it had suddenly reversed course to rely exclusively on the 1983-85 study to determine occupied habitat at the time of listing when its biologists had previously discounted that study and considered other scientific information more important.

90.     In sum, the Service has admitted the existing population of caribou in the southern Selkirk Mountains is at risk of extirpation, and that historically the population was much larger and was distributed over a larger area. The Service failed to explain in the final rule why designating just the habitat that the current imperiled population is using is adequate to ensure the recovery of the population when it had determined in the proposed rule and draft final rule that a much larger area was essential for the conservation of the species.

## CLAIM FOR RELIEF

**The Final Critical Habitat Designation for the Southern Selkirk Mountains Woodland Caribou Population Violated the ESA and APA**

91.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

92.     The ESA requires the Service to designate a listed species' critical habitat to the maximum extent prudent and determinable using the best available science. 16 U.S.C. §§ 1533(a)(3)(A)(i), 1533(b)(2).

93.     The ESA defines critical habitat as: (1) the specific areas within the geographical area occupied by the species at the time it was listed on which are found those physical and biological features essential to the conservation of the species and which may require special management considerations or protection; and (2) specific areas outside the geographical area

occupied by the species at the time it was listed that the Service determines are essential for the conservation of the species. *Id*. § 1532(5).

94.     "Conservation" means "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary"—i.e. the species is recovered. *Id*. at §1532(3).

95.     As described above, the final critical habitat designation for the southern Selkirk Mountains woodland caribou population violated the ESA and APA for various reasons, including but not limited to the following:

A.  Failing to designate critical habitat that was adequate to ensure the conservation of the population;

B.  Failing to designate any unoccupied habitat without adequate explanation and support to show such habitat was not necessary to ensure the conservation of the population;

C.  Reducing the amount of critical habitat from what had been included in the proposed rule and draft final rule without adequate explanation or support; and

D.  Failing to rely on the best scientific data available.

96.     When issuing rules under the ESA, including critical habitat rules, the Service must comply with the requirements of section 553 of the Administrative Procedure Act. 16 U.S.C. § 1533(b)(4). These requirements include providing public notice and opportunity for comment on proposed rules. 5 U.S.C. § 553(b)-(c).

97.     The Service violated the ESA and APA in issuing the final critical habitat rule without first providing for additional public notice and opportunity for comment due to the substantial reduction in critical habitat from what had been proposed originally.

98.     For these reasons, the issuance of the final critical habitat designation for the southern Selkirk Mountains population of woodland caribou was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the ESA and APA, and therefore violates the APA, 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.     Order, declare, and adjudge that the final critical habitat designation for the southern Selkirk Mountains woodland caribou population was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the ESA and APA;

B.     Set aside the final critical habitat designation for the southern Selkirk Mountains woodland caribou population;

C.     Order the U.S. Fish and Wildlife Service to promptly rewrite its critical habitat designation for the southern Selkirk Mountains woodland caribou population in compliance with the requirements of the ESA and APA;

D.     Issue such temporary, preliminary, and/or permanent injunctive relief as may specifically be requested hereafter by Plaintiffs;

E.     Award Plaintiffs their reasonable attorney fees, costs, and litigation expenses under the ESA, 16 U.S.C. § 1540(g), the Equal Access to Justice Act, and/or any other applicable provision of law; and

F.     Grant such further and additional relief as the Court deems just and proper in order to remedy the violations of law alleged herein and to protect the interests of Plaintiffs, the public, and the affected species.

Dated: September 30, 2013                    Respectfully submitted,


                                              s/Lauren M. Rule
                                             Lauren M. Rule (ISB #6863)
                                             ADVOCATES FOR THE WEST
                                             3115 NE Sandy Blvd., Suite 223
                                             Portland, OR 97232
                                             (503) 914-6388
                                             lrule@advocateswest.org

                                             Jason C. Rylander  (DCB #474995)
                                             DEFENDERS OF WILDLIFE
                                             1130 17th Street, NW
                                             Washington, DC 20036
                                             (202) 772-3245
                                             jrylander@defenders.org

                                             Attorneys for Plaintiffs