Lauren M. Rule (ISB #6863)
ADVOCATES FOR THE WEST
3115 NE Sandy Blvd., Suite 223
Portland, OR 97232
(503) 914-6388
lrule@advocateswest.org

Jason C. Rylander (DCB #474995)
DEFENDERS OF WILDLIFE
1130 17th Street, NW
Washington, DC 20036
(202) 772-3245
jrylander@defenders.org

Attorneys for Plaintiffs


# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO


| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, ) <br> DEFENDERS OF WILDLIFE, ) <br> CONSERVATION NORTHWEST ) <br> IDAHO CONSERVATION LEAGUE ) <br> SELKIRK CONSERVATION ALLIANCE, ) <br> and THE LANDS COUNCIL; ) <br> ) <br>      Plaintiffs, ) <br> ) <br> v. ) <br> BRIAN KELLY, U.S. Fish and Wildlife ) <br> Service Idaho State Supervisor, and ) <br> U.S. FISH AND WILDLIFE SERVICE; ) <br> ) <br>      Defendants. ) <br> _____ ) | No. 1:13-cv-00427-ELJ <br><br> **PLAINTIFFS' OPENING BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................ 2

   I.  Southern Selkirk Mountains Woodland Caribou ........................................................ 2

  II.  Critical Habitat Designation ....................................................................................... 6

LEGAL BACKGROUND .................................................................................................. 10

ARGUMENT ..................................................................................................................... 12

   I.  STANDARD OF REVIEW ....................................................................................... 12

  II.  THE FINAL CRITICAL HABITAT DESIGNATION FOR THE SOUTHERN
      SELKIRK MOUNTAINS WOODLAND CARIBOU IS UNLAWFUL ......................... 13

      A.    The Critical Habitat Designation is Arbitrary and Capricious and Contrary to the
           ESA because it Fails to Explain How it Provides for Recovery of the Species .... 13

           1.    Recovery Objectives for the Southern Selkirk Caribou Population. ............. 15

           2.    Final Critical Habitat Rule Ignored Caribou Recovery Needs. .................... 17

                a.    The record shows FWS's decision-making was not based
                      on a rational and well-reasoned analysis. .......................................... 18

                b.    FWS's reasons for not designating unoccupied habitat were arbitrary
                      and capricious and contrary to the purpose of the
                      ESA ................................................................................................... 19

                    1.  Decline of population and range ................................................... 20

                    2.  Reliance on Canadian lands .......................................................... 25

      B.  The Final Critical Habitat Rule Violated the Procedural Requirements of the ESA
          and APA by Failing to Provide for Public Notice and Comment on the
          Substantially Revised Designation. ....................................................................... 28

CONCLUSION .................................................................................................................. 32

# TABLE OF AUTHORITIES

**Cases**

*Alliance for the Wild Rockies v. Lyder*,
    728 F. Supp. 2d 1126 (D. Mont. 2010) ...................................................................15, 20

*Arizona Cattle Growers' Ass'n v. Salazar*,
    606 F.3d 1160 (9th Cir. 2010) ...........................................12, 14, 15, 20, 21, 28

*Bear Valley Mutual Water Co. v. Salazar*,
    No. SACV 11-01263-JVS, 2012 WL 5353353 (C.D. Cal. Oct. 17, 2012) ......................21

*Ctr. for Biol. Diversity v. BLM*,
    422 F. Supp. 2d 1115 (N.D. Cal. 2006)........................................................15, 28

*Ctr. for Biol. Diversity v. Kempthorne*,
    607 F. Supp. 2d 1078 (D. Ariz. 2009) .........................................15, 21, 23, 26

*Ctr. for Biol. Diversity v. Norton*,
    240 F. Supp. 2d 1090 (D. Ariz. 2003) ...............................15, 23, 26, 27, 29, 32

*Ctr. for Biol. Diversity v. U.S. Army Corps of Eng'rs*,
    No. CV 03-29-M-DWM  (D. Mont. May 25, 2005) ...................................20, 24

*Ctr. for Biol. Diversity v. U.S. Fish & Wildlife Serv.*,
    No. 5:09-cv-90, 2011 WL 73494 (C.D. Cal. Jan. 8, 2011) ..............................20

*Defenders of Wildlife v. Flowers*,
    414 F.3d 1066 (9th Cir. 2005) ............................................................14

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
    378 F.3d 1059 (9th Cir. 2004) .......................................................15, 20, 21

*Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*,
    616 F.3d 983 (9th Cir. 2010) ..................................................................15

*Idaho Farm Bureau Fed'n v. Babbitt*,
    58 F.3d 1392 (9th Cir. 1995) ........................................................28, 29, 32

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................12

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    524 F.3d 917 (9th Cir. 2008) ..................................................................13

*Natural Res. Def. Council v. EPA,*
    279 F.3d 1180 (9th Cir. 2002) ........................................................... 29

*Natural Res. Def. Council v. U.S. Dep't of Interior,*
    113 F.3d 1121 (9th Cir. 1997) ...............................................12-13, 26, 27, 28

*Ocean Advocates v. U.S. Army Corps of Eng'rs,*
    402 F.3d 846 (9th Cir. 2005) ............................................................ 13

*Rybachek v. EPA,*
    904 F.2d 1276 (9th Cir. 1990) ........................................................... 29

*Sierra Club v. Marsh,*
    816 F.2d 1376 (9th Cir. 1987) ......................................................14, 20

*TVA v. Hill,*
    437 U.S. 153 (1978) ....................................................................14, 20

*Trout Unlimited v. Lohn,*
    559 F.3d 946 (9th Cir. 2009) ........................................................... 14

**Federal Statutory Provisions**

16 U.S.C. § 1531(b) ...................................................................... 10, 14
16 U.S.C. § 1532(3) ........................................................................ 11
16 U.S.C. § 1532(5) ...................................................................... 11, 17
16 U.S.C. § 1532(6) ........................................................................ 10
16 U.S.C. § 1532(20) ....................................................................... 10
16 U.S.C. § 1533(a)(1) ..................................................................... 10
16 U.S.C. § 1533(a)(3)(A)(i) ............................................................... 11
16 U.S.C. § 1533(b)(2) ..................................................................... 12
16 U.S.C. § 1533(b)(4) ................................................................... 12, 28
16 U.S.C. § 1533(b)(5) ..................................................................... 28
16 U.S.C. § 1536(a)(2) ..................................................................... 11
5 U.S.C. § 553(b)-(c) .................................................................... 12, 28
5 U.S.C. § 706(2)(D) .................................................................... 28, 32

**Federal Regulations**

50 C.F.R. § 424.12(b) ...................................................................... 11
50 C.F.R. § 424.16(c) ...................................................................... 28

**Other**

H.R. Rep. No. 94-887 (1976) ...................................................................................15
H.R. Rep. No. 95-1625 (1978) .................................................................................14

## INTRODUCTION

Plaintiffs Center for Biological Diversity *et al.* bring this action to challenge Defendant U.S. Fish and Wildlife Service's ("FWS") critical habitat designation for the endangered Southern Selkirk Mountains population of woodland caribou.  FWS initially proposed to designate 375,562 acres of critical habitat for the caribou, but reduced that by more than 90% in its final rule, designating just 30,010 acres.  Because FWS did not provide an adequate explanation or support for such a drastic reduction, its critical habitat designation is arbitrary and capricious and contrary to the requirements of the Endangered Species Act ("ESA").

The very purpose of critical habitat designations is to provide for the *recovery* of the species.  The Southern Selkirks population of caribou has declined significantly and is at such extremely low numbers that FWS deems it to be "at risk of extirpation."  The recovery plan for this population determined that the population would need to increase in size and in geographic distribution for it to recover.  Yet, FWS's final critical habitat designation covers only the area occupied by the extremely imperiled population.  FWS did not adequately explain how such a limited amount of critical habitat is sufficient to recover the Southern Selkirk Mountains caribou population, or why it had eliminated habitat that it had considered essential for recovery in the proposed rule and the recovery plan.   Rather than recovering this population, the final critical habitat designation will only lead to extinction of this species from the United States.

Moreover, FWS did not allow for adequate public notice and comment because the final rule deviated significantly from the proposed rule and the public was not given notice or allowed to comment on those changes.  The final rule relied on new reasoning and factors that were not in the proposed rule and thus it was not a logical outgrowth of the proposed rule.  Because FWS failed to provide for notice and comment on the reduced designation, it violated procedural

PLAINTIFFS' OPENING BRIEF IN SUPPORT OF SUMMARY JUDGMENT          1

requirements of the ESA and Administrative Procedure Act ("APA").

## FACTUAL BACKGROUND

### I.      Southern Selkirk Mountains Woodland Caribou

The Southern Selkirk Mountains population of woodland caribou has been listed as an endangered species under the ESA since 1984, but FWS just recently designated its critical habitat.  Plaintiffs' Separate Statement of Facts ("SOF") (filed herewith) ¶¶ 12, 36; AR 2, 27442.  Historically, woodland caribou were widely distributed across the northern tier of the United States, but the last remaining population in this country is the Southern Selkirk Mountains population.  SOF ¶¶ 1-2; AR 3416, 28769.  At the time it was listed as endangered, this population numbered only about thirty animals, and the winter census of 2012 detected twenty-seven caribou.  SOF ¶¶ 9, 12; AR 15, 27442.

There are three ecotypes of woodland caribou—mountain, northern, and boreal—which are differentiated by the type of habitat occupied, movement patterns, and feeding behavior.  SOF ¶ 2; AR 28769.  The Southern Selkirk Mountains population of woodland caribou is part of the mountain caribou "ecotype" of woodland caribou.  *Id.*  There are seventeen other populations of mountain caribou, which all occur in British Columbia ("B.C."), and many of these have also declined in size and range, with ten populations having fewer than fifty animals and two others believed to have been extirpated in the last ten years.  SOF ¶ 10; AR 3433.  Because of this overall decline, the entire global population of mountain caribou is considered to be at risk of extirpation and is listed as threatened under Canada's Species at Risk Act.  SOF ¶ 11; AR 3424, 3433.

Mountain caribou make seasonal habitat movements, but are generally found in high-elevation mature or old-growth coniferous forests.  SOF ¶¶ 3, 5-6; AR 28-30.  In early winter,

they use old-growth hemlock/cedar stands that have dense canopy cover, which intercepts snow and leaves ground vegetation available while snow cover is relatively light.  SOF ¶ 5; AR 30.  As snowpack increases and consolidates, the caribou move up in elevation to old-growth fir/spruce ridgetops, where they walk on top of the compacted snow and subsist on arboreal lichen.  *Id.*  In spring, the animals move back down to lower elevations to forage on new green vegetation, and in summer return to lush valleys and riparian areas in higher elevation forests.  SOF ¶ 6; AR 30.  A key requirement for caribou is that these seasonal habitats occur in large contiguous areas, with little or no vehicle access and disturbance, so that the animals can spread out at low densities to avoid predators.  SOF ¶ 3; AR 28.

The primary long-term threat to mountain caribou is the ongoing loss and fragmentation of contiguous old-growth forests and forest habitats due to a combination of timber harvest, wildfires, and road development.  SOF ¶ 4; AR 28.  This habitat alteration and fragmentation also leads to increased predation of caribou due to:  (1) an increase in early-seral forests that attract other ungulates which normally do not overlap with caribou, and therefore attract predators that opportunistically prey on caribou along with the other ungulates; (2) forcing caribou to concentrate in smaller, disconnected patches of old-growth forest, making it easier to find and prey on caribou; and (3) increasing road densities and snowmobile trails that facilitate movement of predators into caribou range.  SOF ¶ 4; AR 3437-38.  Human access into caribou habitat is also a threat to mountain caribou as it can disturb and displace them from the remaining high-quality habitat on the landscape.  SOF ¶ 4; AR 3442-43, 3532-34.

As a result of habitat loss and fragmentation, over-hunting, and predation, mountain caribou range has declined by approximately 60% according to some estimates, when considering historic range within both B.C. and the U.S.  SOF ¶ 10; AR 3416.  As of 2002, the

Mountain Caribou Technical Advisory Committee estimated a 38% reduction in caribou habitat suitability across its range compared to historic levels.  AR 3436.

The size and range of the Southern Selkirk Mountains caribou population has declined significantly from its historic distribution.  SOF ¶¶ 7-8.  Mountain caribou used to occupy habitat in Washington, Idaho, Montana, and perhaps Wyoming; and in Idaho occurred as far south as Salmon, Idaho.  SOF ¶ 7; AR 3416-17.  Caribou were reported near the St. Joe and Clearwater Rivers in the 1880s, and as recently as 1959 were seen in the city of St. Maries.  SOF ¶ 7; AR 28769.  This population was abundant in the late 1800s and early 1900s, and consisted of about 100 animals in the 1950s.  SOF ¶ 8; AR 3186, 3416, 27442.

As noted above, this population has now dwindled to just twenty-seven animals and is at risk of extirpation, and is separated from the next closest mountain caribou populations by thirty to sixty miles.  SOF ¶ 9; AR 15, 28769-70.  The population was augmented with transplants in the 1980s and 1990s, but has since dropped back down to the same number of animals that existed at the time it was listed as endangered.  AR 28770; AR 15.  Although this population currently uses habitat near the Canadian border, winter censuses and other verified sightings of caribou occurred in 2003, 2004, and 2007 farther south along the Selkirk Crest in Idaho east of Priest Lake.  SOF ¶ 40; AR 28791-94, 28665, 28654.  FWS noted additional sightings of caribou along the crest from 2000-2008 in a 2008 biological opinion.  SOF ¶ 40; AR 3538-39.

When FWS listed this population as endangered, it stated that the Southern Selkirk Mountains caribou was one of the most critically endangered mammals in the U.S, and that 100 animals was estimated to be a viable population.  SOF ¶ 12; AR 27442-43, 27458.  The Woodland Caribou Recovery Team set a goal of 125 animals for this population in Recovery Action Plans issued in 2001 and 2002.  SOF ¶ 16; AR 28666, 28714.  More recently, in the 2008

status review of the population, FWS confirmed that the contracting range of the population, the small number of animals in the population, and the limited genetic exchange between this population and adjacent populations threaten population viability.  AR 3445.  It also recognized the importance of this particular population to the viability of the entire mountain caribou metapopulation.  AR 3425, 3427.

FWS completed a recovery plan for the Southern Selkirk Mountains caribou population in 1985 and revised it in 1994.  SOF ¶ 13; AR 3051, 3174.  The plan contained an objective to maintain an increasing population, and stated that for recovery, woodland caribou in the Selkirks must be distributed over a wider area than at present.  SOF ¶ 13; AR 3179, 3217.  The plan delineated a Recovery Area of 5,700 km$^2$ (1.4 million acres) in northern Idaho, northeastern Washington, and southern B.C., with about 47% in B.C. and 53% in the U.S.  SOF ¶ 14; AR 3186, 3241.  The recovery plan identified 443,360 acres of potential caribou habitat in the Selkirk ecosystem in the U.S. and Canada, and stated an objective of securing, enhancing, and managing this amount of habitat to support a self-sustaining caribou population.  SOF ¶ 14; AR 3179, 3203.  Of the 443,360 acres of potential habitat identified, 331,150 acres (75%) were in the U.S., and 112,210 (25%) were in B.C.  SOF ¶ 14; AR 3203.  The recovery plan stated that conservation of caribou habitat is vital to the recovery of the Selkirk caribou, and that the various seasonal habitats must be maintained and enhanced to support Selkirk caribou at recovery levels.  SOF ¶ 14; AR 3211-12.

A few years before the final critical habitat rule came out, FWS issued a biological opinion that reiterated the recovery plan objectives.  SOF ¶ 15; AR 3453.  It stated that the primary conservation need of the Southern Selkirk caribou population was to expand the size and distribution of the existing population.  SOF ¶ 15; AR 3536, 3561.  FWS noted in the opinion

that, although the recovery plan was somewhat dated, the conservation needs outlined in the plan

are still relevant.  SOF ¶ 15; AR 3536.  FWS highlighted the recovery plan's objectives to

manage for an increasing caribou population that is well distributed throughout the recovery

area, and for securing and enhancing sufficient caribou habitat in the Selkirk ecosystem to

support a self-sustaining caribou population.  SOF ¶ 15; AR 3536.

## II.     Critical Habitat Designation

FWS issued its proposed critical habitat rule on November 30, 2011, proposing to

designate 375,562 acres of critical habitat.  SOF ¶ 17; AR 28768.  The objective of the proposed

designation was to support life-history needs of the species and provide for the conservation of

the species, where conservation is defined as the use of all methods to bring an endangered

species to the point at which the measures provided by the ESA are no longer necessary.  SOF ¶

18; AR 28773, 28780.  The proposed rule stated that the designation would support the actions

and conservation objectives needed to recover the Southern Selkirk Mountains population of

woodland caribou that were established in the recovery plan.  SOF ¶ 19; AR 28772.  It

specifically noted the statement in the recovery plan that for recovery, woodland caribou in the

Selkirks must be distributed over a wider area than at present.  SOF ¶ 19; AR 28773.  The bulk

of the current small population occupies habitat in the B.C. portion of the recovery area, although

there is continued movement back and forth across the B.C./U.S. border.  SOF ¶ 19; AR 28772.

FWS identified in the proposed rule the necessary physical and biological features

essential to caribou recovery based on the seasonal habitat needs of mountain caribou.  SOF ¶

20; AR 28775-76.  These features focused on large contiguous areas of high-elevation habitat

that allow caribou to spread out at low densities, avoid predators, and obtain sufficient arboreal

lichen, as well as transitional areas that connect caribou seasonal habitats.  *Id.*  FWS then

described the primary constituent elements essential to the conservation of the species, which included: (1) mature to old-growth hemlock/cedar climax forest and fir/spruce climax forest over 4,000 feet in elevation and with 70% or greater canopy closure; and (2) ridge tops with deep snowpack that are generally 6,000 feet in elevation or higher, in mature or old stands of fir/spruce climax forest with relatively open canopy.  SOF ¶ 21; AR 28776-77.

FWS created the proposed critical habitat designation by first mapping the areas described in the 1984 final listing rule as occupied by caribou and delineating areas over 4,000 feet in elevation, then overlaying seasonal telemetry data collected from 1987 through 2004, the recovery area boundary, caribou movement corridors, and results of the seasonal habitat suitability model developed by Kinley and Apps (2007) to refine the proposed critical habitat boundaries.  SOF ¶¶ 22-23; AR 28778.  FWS removed small isolated patches, areas that lacked primary constituent elements, or had few historical telemetry points, and added areas below 4,000 feet in elevation where seasonal connectivity between habitats was required, to create the final proposed critical habitat map.  SOF ¶ 24; AR 28778.  This resulted in 375,562 acres of critical habitat in Idaho and Washington, with 294,947 acres on Federal land, 65,236 acres on State of Idaho land, and 15,379 acres on private land.  SOF ¶ 25; AR 28779.

FWS determined that, at the time of listing, caribou occupied the entire designated area and that this area contained all of the physical or biological features essential to the conservation of the Southern Selkirk Mountains caribou population.  FWS also considered whether designating additional areas outside those occupied by caribou were necessary to ensure the conservation of the species, but determined that the proposed designation was sufficient for the species' conservation, noting that the area proposed generally followed the recovery areas identified in the recovery plan.  SOF ¶ 26; AR 28777.

After publishing the proposed rule, FWS accepted public comments on it and sent it to four peer reviewers for comments.  SOF ¶ 27; AR 2, 28768.  FWS received hundreds of public comments, and responses from the four peer reviewers.  SOF ¶¶ 27-28; AR 5037-21969, 22424-35, 22445-60.  One peer reviewer simply stated that he found the proposed rule very thorough and accurate and therefore was not submitting any comments.  SOF ¶ 28; AR 22435.  The other three peer reviewers submitted substantive comments.  SOF ¶¶ 29-31; AR 22424-34, 22445-60.

The reviewers agreed that the area proposed for designation was sufficient habitat to provide for the conservation of the species, and emphasized the need for large and contiguous areas containing seasonal habitats and corridors connecting areas of high quality habitat.  SOF ¶¶ 29-31; AR 22432, 22434, 22428, 22449-50, 22455.  Two of the reviewers recommended using the Kinley and Apps habitat modeling and Wakkinen movement corridor analysis to refine the proposed designation.  AR 22427-31, 22450, 22457.  These analyses showed caribou habitat and movement corridors in the Selkirk ecosystem, including substantial habitat and numerous corridors throughout the Selkirk Mountains of Idaho.  AR 1927-32 (habitat suitability maps), 4028 (corridor map).  The reviewers noted, however, that the entire area designated as critical habitat in the proposed rule was not likely occupied by the small population of caribou that existed at the time the species was listed as endangered based on studies from 1983-85.  SOF ¶¶ 29-31; AR 22434, 22424, 22455-57.

FWS considered a variety of alternatives for its final designation after receiving all comments, and completed a draft final rule in August 2012.  SOF ¶¶ 32-33; AR 22462-75, 671-72.  The draft final rule designated 227,100 acres of critical habitat, which was less than the area designated in the proposed rule due to changing the elevation cut-off from 4,000 feet to 5,000 feet.  SOF ¶ 33; AR 667, 672, 820, 24746.  The draft final rule continued to consider all of the

designated area as occupied by caribou at the time of listing, but stated that even if "some of the areas being designated in this final rule are outside the geographical area occupied by the species at the time of listing, the determination that the areas being designated in this final rule are essential to the conservation of the species would still apply."  SOF ¶ 33; AR 698.

A few weeks after writing the draft final rule, FWS changed course and decided to drastically reduce the critical habitat designation.  SOF ¶ 34; AR 23396-401.  The agency determined that the area actually occupied by caribou at the time of listing was much smaller based on the 1983-85 studies, and decided to designate as critical habitat just the area that was occupied at that time.  SOF ¶ 34; AR 23397.  FWS recognized that it would need to explain both why it was removing much of the area that had been included in the proposed designation as essential to the conservation of the species, and also how this new designation leads to recovery and conservation of the species.  SOF ¶ 34; AR 23397.  FWS then hurriedly collected information to support its new decision, including information about Canadian lands, in order to finish revising the designation within two weeks.  SOF ¶ 35; AR 23182-83, 23164-65, 23148.

The final critical habitat rule was published on November 28, 2012 and designated just 30,010 acres of critical habitat.  SOF ¶ 36; AR 2.  All of the lands designated were Federal lands.  SOF ¶ 36; AR 34.  FWS limited the designation to the area occupied by the Southern Selkirk Mountains caribou population at the time of its listing that was above 5,000 feet in elevation.  SOF ¶ 36; AR 34.  It determined the "occupied area at the time of listing" based on the study by Scott and Servheen from 1983-85.  SOF ¶ 37; AR 24.  The rule stated that since 2001, annual censuses have documented caribou in the U.S. only near the Canadian border, and sightings farther south in Idaho were all anecdotal, so not considered by the agency.  SOF ¶ 39; AR 24, 28.

FWS did not designate any lands that were unoccupied at the time of listing.  SOF ¶ 38;

AR 26-27.  Its reasoning for not including unoccupied habitat was that the population had

declined and its range had contracted so that it currently just used habitat in the U.S. near the

Canadian border; transplant efforts to augment the population had not been successful; and that

lands in Canada, combined with the 30,010 acres designated in the U.S., met the recovery plan's

objective of securing 443,000 acres of habitat.  SOF ¶ 38; AR 23, 26-27.

        In sum, FWS has decided to write-off the woodland caribou in the U.S.  Its reasoning

here—as populations get smaller and use less area, less critical habitat is needed—is directly

contrary to the purpose of the ESA, which is to recover species.  Simply protecting habitat that

supports the existing small population of caribou in the Southern Selkirks, which is admittedly at

risk of extirpation, will not lead to recovery and conservation of the species.  FWS itself has

repeatedly stated that for recovery, this population must expand in size and in geographic

distribution, yet nowhere in the final rule does it explain how the critical habitat designated here

will provide for such expansion.  Accordingly, the final critical habitat rule is arbitrary and

capricious and contrary to the ESA, and must be set aside.

## LEGAL BACKGROUND

        The ESA was enacted to "provide a means whereby the ecosystems upon which

endangered species and threatened species depend may be conserved [and] to provide a program

for the conservation of such [] species."  16 U.S.C. § 1531(b).  Under the ESA, the Secretary of

the Interior or Commerce ("the Secretary") lists a species as endangered if it is "in danger of

extinction throughout all or a significant portion of its range," or as threatened if it is "likely to

become an endangered species within the foreseeable future."  *Id.* §§ 1533(a)(1), 1532(6) & (20).

Concurrently with listing a species as threatened or endangered, the Secretary also must

designate the species' "critical habitat" to the maximum extent prudent and determinable.  *Id.* §

1533(a)(3)(A)(i).  Once critical habitat is designated, the ESA prohibits federal agencies from authorizing, funding, or carrying out any action that is likely to result in the destruction or adverse modification of that habitat.  *Id.* § 1536(a)(2).

The ESA defines critical habitat as: (1) the specific areas within the geographical area occupied by the species at the time it was listed on which are found those physical and biological features essential to the conservation of the species and which may require special management considerations or protection; and (2) specific areas outside the geographical area occupied by the species at the time it was listed that the Service determines are essential for the conservation of the species.  *Id.* § 1532(5).  "Conservation" is defined in the ESA as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary"—i.e. the species is recovered.  *Id*. §1532(3).

ESA regulations state that when determining critical habitat, FWS shall consider those physical and biological features that are essential to the conservation of a species and that may require special management considerations or protection, where such requirements include: (1) space for individual and population growth, and for normal behavior; (2) food, water, air, light, minerals, or other nutritional or physiological requirements; (3) cover or shelter; (4) sites for breeding, reproduction, rearing of offspring, germination, or seed dispersal; and (5) habitats that are protected from disturbance or are representative of the historic geographical and ecological distributions of a species.  50 C.F.R. § 424.12(b).  In its critical habitat determination, FWS must focus on the principal biological or physical constituent elements within the defined area that are essential to the conservation of the species and must list the known primary constituent elements with the critical habitat description.  *Id.*

A critical habitat designation must be based on the best scientific data available and must take into consideration the economic impact, and any other relevant impact, of specifying any particular area as critical habitat.  16 U.S.C. § 1533(b)(2).  FWS may exclude any area from critical habitat if it determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless it determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.  *Id.*

When issuing rules under the ESA, including critical habitat rules, FWS must comply with the requirements of section 553 of the Administrative Procedure Act.  16 U.S.C. § 1533(b)(4).  These requirements include providing public notice and opportunity for comment on proposed rules.  5 U.S.C. § 553(b)-(c).

## ARGUMENT

## I.     STANDARD OF REVIEW

Critical habitat designations are agency actions reviewed under the arbitrary and capricious standard of the APA.  *Arizona Cattle Growers' Ass'n v. Salazar,* 606 F.3d 1160, 1163 (9th Cir. 2010).  Such actions are arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 43 (1983)).  An agency must have adequately considered the relevant factors and articulated a rational connection between the facts found and the determinations made, and the decision must have a substantial basis in fact.  *Id.; Natural Res. Def. Council v.*

*U.S. Dep't of Interior,* 113 F.3d 1121, 1124 (9th Cir. 1997).

When reviewing an agency action, a court must "engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on the record before it." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,* 524 F.3d 917, 927 (9th Cir. 2008).   It "must not rubber stamp . . . administrative decisions that [it deems] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute."  *Ocean Advocates v. U.S. Army Corps of Eng'rs,* 402 F.3d 846, 859 (9th Cir. 2005).

## II.    THE FINAL CRITICAL HABITAT DESIGNATION FOR THE SOUTHERN SELKIRK MOUNTAINS WOODLAND CARIBOU IS UNLAWFUL.

The final critical habitat rule for the Southern Selkirk Mountains woodland caribou violates the ESA and APA for two reasons.  First, FWS did not adequately explain how the limited amount of critical habitat designated in the final rule is sufficient to recover this population of caribou, as required to satisfy the APA's standards and to achieve the purpose of the ESA. Second, FWS violated the procedural requirements of the APA and ESA by not providing notice and public comment on the significant changes to the critical habitat designation before issuing the final rule.  For these reasons, this Court must set aside the final critical habitat rule and remand the rule to FWS to revise it in compliance with the law.

### A.  The Critical Habitat Designation is Arbitrary and Capricious and Contrary to the ESA because it Fails to Explain How it Provides for Recovery of the Species.

The primary flaw with the critical habitat designation for the Southern Selkirk Mountains caribou population is that it is contrary to the goal of the ESA and the very purpose of critical habitat—which is to *recover* endangered and threatened species.  This population is far below a viable level, and FWS has stated numerous times that its size and geographic range must expand to achieve recovery.  Yet, in the final rule, FWS designates just the area being used by this small

population and refuses to designate unoccupied habitat that it itself admitted is essential for the conservation of the species.  Because FWS has not provided a rational connection between the facts in the record and its final designation, that designation is arbitrary and capricious.

As noted by the Ninth Circuit and the legislative history of the Act, the purpose of the ESA is to "prevent animal and plant species endangerment and extinction caused by man's influence on ecosystems, and *to return the species to the point where they are viable components of their ecosystems*."  *Trout Unlimited v. Lohn,* 559 F.3d 946, 949 (9th Cir. 2009) (quoting H.R. Rep. No. 95-1625, at 5 (1978), *reprinted in* 1978 U.S.C.C.A.N. 9453, 9455) (emphasis added). The Supreme Court stated in *Tennessee Valley Authority v. Hill* that "Congress intended endangered species to be afforded the highest of priorities," and the "plain intent of Congress in enacting [the] statute was to halt and reverse the trend toward species extinction, whatever the cost." *TVA v. Hill,* 437 U.S. 153, 174, 184 (1978).

The Ninth Circuit has repeatedly recognized the ESA's conservation goals and its policy of "institutionalized caution" for protected species.  *Arizona Cattle Growers,* 606 F.3d at 1167 (citing *Defenders of Wildlife v. Flowers,* 414 F.3d 1066, 1074 (9th Cir. 2005); *Sierra Club v. Marsh,* 816 F.2d 1376, 1386 (9th Cir. 1987) ("Congress clearly intended that [agencies] give the highest of priorities and the benefit of the doubt to preserving endangered species." (internal quotation marks omitted))).  Congress also acknowledged the destruction of "natural habitat" to be the main threat to species, and therefore the conceptual basis of the ESA provides "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved."  16 U.S.C. § 1531(b); *TVA v. Hill,* 437 U.S. at 179.  "[T]he preservation of a species' habitat is essential to the preservation of the species itself," as expressed in the legislative history of the act, which stated that "the ultimate effectiveness of the Endangered

Species Act will depend on the designation of critical habitat." *Center for Biological Diversity v. Norton,* 240 F. Supp. 2d 1090, 1098 (D. Ariz. 2003); H.R. Rep. No. 94-887, at 3 (1976).

In accordance with these principles, the Ninth Circuit has stated that Congress did not intend the ESA "merely to forestall the extinction of species (i.e. promote a species survival), but to allow a species to recover to the point where it may be delisted." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.,* 378 F.3d 1059, 1070 (9th Cir. 2004). Thus, "the purpose of establishing 'critical habitat' is for the government to carve out territory that is not only necessary for the species' survival but also essential for the species' recovery." *Id.* This purpose requires designating *more* habitat than just what is necessary for a species' survival. *Id.* Numerous cases have reaffirmed that the purpose of designating critical habitat is to *recover* a species. *Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.,* 616 F.3d 983, 989 (9th Cir. 2010); *Arizona Cattle Growers,* 606 F.3d at 1166; *Alliance for the Wild Rockies v. Lyder,* 728 F. Supp. 2d 1126, 1138 (D. Mont. 2010); *Ctr. for Biological Diversity v. Kempthorne,* 607 F. Supp. 2d 1078, 1089-90 (D. Ariz. 2009); *Ctr. for Biological Diversity v. BLM,* 422 F. Supp. 2d 1115, 1142, 1144 (N.D. Cal. 2006). FWS has not explained or shown how the final critical habitat designation here leads to recovery of the Southern Selkirk Mountains woodland caribou, in violation of the ESA and APA.

1.      **Recovery Objectives for the Southern Selkirk Caribou Population.**

At the time the Southern Selkirk Mountains caribou population was listed as endangered, it was down to about thirty animals, and was considered one of the most critically endangered mammals in the U.S. AR 27442. The listing rule stated that the population was at "a level that probably cannot sustain the herd much longer," and "[a]dditional losses could be disastrous." *Id.* The listing rule estimated that a population of about 100 animals would be a viable level, noting

that about 100 caribou still existed in the population in the 1950s.  AR 27443.  Subsequent

Recovery Action Plans from 2001 and 2002 written by the Woodland Caribou Recovery Team

used a goal of 125 animals for this population.  AR 28666, 28714.  Translocated animals

augmented the population in the 1980s and 1990s, likely preventing its extirpation, but the

population dropped back down to twenty-seven animals by 2012.  AR 3432, 23122, 28772.

Canadian documents related to mountain caribou management report that the South Selkirks

population is at a low viability level and at high risk of extirpation under current conditions.  AR

2456, 2503.

        In order to achieve recovery, the recovery plan for this caribou population included an

objective to maintain an increasing population; stated that for recovery, woodland caribou in the

Selkirks must be distributed over a wider area than its existing distribution; and delineated a

recovery area of 1.4 million acres, with slightly more than half of that area in the U.S.  AR 3179,

3186, 3217, 3241.  Although FWS has acknowledged that information in the recovery plan about

caribou habitat requirements is outdated, it nevertheless confirmed in a 2008 biological opinion

that the recovery objectives from the recovery plan regarding the need to expand the population

size and distribution are still valid.  AR 3536.  The 2008 opinion stated that objectives outlined

in the recovery plan "include managing for an increasing caribou population that is well

distributed throughout the recovery area, and for securing and enhancing sufficient caribou

habitat in the Selkirk ecosystem to support a self-sustaining caribou population," and that the

primary conservation needs of the Selkirk caribou population continue to include the need to

"[e]xpand the size and distribution of the existing population."  AR 3536, 3561.

        The proposed critical habitat rule likewise stated that "[t]he current recovery plan

establishes the actions and conservation objectives needed to recover the southern Selkirk

Mountains population of the woodland caribou.  The proposed critical habitat designation will support those objectives . . . ."  AR 28772.  The proposed rule noted that "[t]he recovery plan also states that for recovery, woodland caribou in the Selkirks must be distributed over a wider area than at present (USFWS 1994, p. 36).  Optimally, this would include habitat in both B.C. and the U.S."  AR 28773.  Thus, prior to the final rule, FWS confirmed the need to increase the population size and increase the geographic distribution of the population within the U.S. to achieve recovery of the Southern Selkirk Mountains caribou population.

In line with that reasoning, FWS proposed designating 375,562 acres of critical habitat, which it had determined was all occupied by caribou at the time of listing and thus fell within the first criteria under the definition of critical habitat.  AR 28779; 16 U.S.C. § 1532(5).   Because the areas designated, which "generally follow the recovery areas identified in the recovery plan," were "sufficient for the conservation of the species," FWS concluded it did not need to designate any areas that were outside the geographical area occupied by the species at the time it was listed—i.e. unoccupied areas.  AR 28777.

**2.      Final Critical Habitat Rule Ignored Caribou Recovery Needs.**

The final critical habitat rule, however, abandoned all of the recovery needs and objectives for this population when it reduced the critical habitat designation by more than 90% due to a change in its determination of occupied habitat.  AR 2.  According to FWS, it changed its determination of how much area was occupied by this caribou population at the time it was listed based on comments by peer reviewers and reexamining data on this population from a 1983-1985 study.  AR 3-4.  Thus, FWS determined that only 30,010 acres satisfied the first criteria of critical habitat pertaining to the "geographical area occupied by the species at the time it was listed."  AR 4; 16 U.S.C. § 1532(5).   Then FWS claimed that there were no unoccupied

areas essential for recovery of the species that would fall under the second part of the critical habitat definition, resulting in a final designation of just 30,010 acres.  AR 27.  The flaw with this second conclusion is that it was not adequately explained or supported by the record.

### a. The record shows FWS's decision-making was not based on a rational and well-reasoned analysis.

The administrative record makes it clear that FWS changed its mind suddenly about the critical habitat determination and then scrambled to justify that conclusion and write the final rule.  After the peer review and public comment period ended in late May 2012, FWS took several months to analyze the comments, consider a variety of alternative final designations, and write a draft final rule by mid-August 2012.  AR 21970, 22462-75, 671.  The draft final rule designated 227,100 acres of critical habitat and still considered the whole area to be occupied by caribou at the time of listing.  AR 672, 698.  The draft final rule stated that the area designated is "essential for the conservation of the species due to its suitable habitat conditions, proximity to similar habitat in British Columbia, and location at the southernmost extent of the species' range."  AR 698.  Moreover, the draft rule concluded that, even if some of the areas being designated "are outside the geographical area occupied by the species at the time of listing, *the determination that the areas being designated in this final rule are essential to the conservation of the species would still apply.*  Conservation of the species under section 3(3) of the Act means to use all methods and procedures necessary to bring any endangered species or threatened species to the point at which the measures provides pursuant to the Act are no longer necessary."  AR 698-99 (emphasis added).

Just a few weeks later, however, FWS decided to completely reverse course.  It not only determined that a much smaller area was actually occupied by caribou at the time of listing, it also refused to consider designating any unoccupied area despite the statement in the draft final

rule just a few weeks earlier that such areas are "essential to the conservation of the species." AR 23396-401, 698; *see also* AR 23402 (FWS scientist questioning occupied habitat determination and suggesting characterizing areas as unoccupied but essential to the conservation of the species). Instead of assessing what areas are essential for recovery of the Southern Selkirk Mountains caribou population, FWS simply decided to limit the designation to occupied habitat, reducing it by more than 90%. AR 23396-401.

Due to deadlines, FWS hurriedly sought out information to try and justify its decision and rewrite the new rule within two weeks. AR 23164-65, 23182-83. FWS recognized it was removing areas that were considered in the proposed critical habitat designation as essential to the conservation of the species, and that it would need to provide an explanation for that change. AR 23397. FWS stated specifically that it would need to describe in the Federal Register how the new designation deviates from the recovery plan "and leads us to Recovery and conservation of the species." *Id.* FWS did not satisfy that requirement because it failed to explain in the final rule how such a limited designation would lead to recovery of the Southern Selkirk Mountains caribou population.

### b. FWS's reasons for not designating unoccupied habitat were arbitrary and capricious and contrary to the purpose of the ESA.

In the final rule, FWS offered two general reasons why no unoccupied habitat was essential to the conservation of the species. It first claimed that unoccupied areas were not essential because of the overall decline of mountain caribou across its range, and in particular the decline of populations in the southern extent of their range, including the Southern Selkirk Mountains population. AR 23, 26-27. Second, it claimed that areas managed for conservation of caribou in Canada combined with the 30,010 acres of critical habitat in the U.S. met the recovery plan's objective of securing 443,000 acres of caribou habitat in the Selkirks. AR 23, 26. Neither

of these explanations is reasonable or shows that the final critical habitat designation is sufficient to recover the Southern Selkirk Mountains caribou population.

## 1.      Decline of population and range

FWS's first reason for not designating unoccupied habitat is based on the significant decline of the species.  This reasoning makes no sense and is directly contrary to the purpose of the ESA and critical habitat designations.  In essence, it means FWS is writing-off this population of caribou, leaving no woodland caribou in the entire U.S.  The ESA does not allow for such an approach, instead requiring that agencies give endangered species "the highest of priorities," and reverse the trend toward extinction "whatever the cost."  *TVA v. Hill*, 437 U.S. at 174, 184; *Sierra Club v. Marsh*, 816 F.2d at 1386.  Critical habitat is not meant to just ensure a species' survival, but to allow for recovery of species.  *Gifford Pinchot*, 378 F.3d at 1070; *Arizona Cattle Growers*, 606 F.3d at 1166.   Restricting designation to just occupied habitat without explaining how that will achieve recovery of the species does not comply with the requirements of the ESA.  *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,* No. 5:09-cv-90, 2011 WL 73494, at * 9 (C.D. Cal. Jan. 8, 2011); *Alliance for the Wild Rockies,* 728 F. Supp. 2d at 1138; *Ctr. for Biological Diversity v. U.S. Army Corps. Of Eng'rs*, Case No. 03-29-M-DWM, Order at 17-18 (D. Mont. May 25, 2005) (attached hereto).  FWS did not explain how limiting critical habitat to the area that the currently small and declining population is using will allow it to recover.

FWS's reasoning in the final rule goes like this:  mountain caribou have declined across their range, the southern extent of the range has declined the most, including the Southern Selkirk Mountains population, transplanting animals has not been successful at increasing the Southern Selkirks population, and the currently small population now only uses areas near the

Canadian border and in B.C.; therefore the land that was used by caribou farther south in the U.S., when the population was larger, is no longer essential for its recovery.  AR 24-26.

        The problem with FWS's reasoning is that it does not show how the small amount of critical habitat designated is adequate for recovery of the population, as is required under the ESA.  *Gifford Pinchot,* 378 F.3d at 1070; *Arizona Cattle Growers,* 606 F.3d at 1166; *see also Bear Valley Mutual Water Co. v. Salazar,* No. SACV 11-01263-JVS, 2012 WL 5353353, at * 22 (C.D. Cal., Oct. 17, 2012) (noting that if unoccupied habitat is essential but is not designated, whatever FWS otherwise designated would be inadequate for conservation of the species).  As noted in *Center for Biological Diversity v. Kempthorne,* the fact that the population's size and range has shrunk so that only a few animals are using habitat in the U.S. is not a sufficient reason to not designate critical habitat.  607 F. Supp. 2d at 1083, 1089-91 (overturning decision to not designate critical habitat for jaguar).  In that case, the record showed that individual jaguars on the edge of the species' range were important for the species as a whole; range expansion could help increase chances for long-term survival; and even though recovery of the species as whole depended on other countries, habitat in the U.S. may be essential for recovery as well, requiring designation of critical habitat.  *Id.* at 1089-91.  The same reasoning applies here.

        This population of caribou was down to a "critically endangered" number of about thirty animals when it was listed under the ESA, and its range in the U.S. had shrunk to an area in Idaho and northeast Washington near the Canadian border.  AR 3, 27442.  This is the same area that FWS designated as critical habitat sufficient for recovery.  AR 3-4, 24.  Yet FWS has repeatedly asserted that for recovery, this population *must increase in size and in geographic distribution*.  AR 3209, 3217, 3536, 3561, 28773.  The Woodland Caribou Recovery Team determined that the population goal for the Southern Selkirk Mountains caribou population is

125, four times the number of caribou in the population in 1984 when it was listed and in 2012 when the final critical habitat rule came out.  AR 28666, 28714 (Recovery Action Plans), 27442 (listing rule), 15 (critical habitat rule).

FWS tries to escape these recovery objectives by asserting that the recovery plan is outdated and does not represent the best available science with regard to the essential conservation needs of the southern Selkirk Mountains population of caribou, "as was recognized in the 2008 5-year review of this population."  AR 24.  Although the 5-year review acknowledged that the recovery plan does not reflect the best available science on caribou and their habitat, the effects of threats, and various options for recovery efforts, it did not state that the objectives of increasing the size and distribution of the population are no longer applicable. AR 3429.  In fact, the 5-year review stated that, "the contracting range of the South Selkirk population, the small number of animals in the population, and the limited genetic exchange between the South Selkirk population and adjacent populations threaten population viability." AR 3445.  FWS confirmed in a biological opinion also issued in 2008, when the population was at 46 animals, that the primary conservation needs for this caribou population still included the need to "[e]xpand the size and distribution of the existing population."  AR 3536, 3561.  These statements clearly show that the current size and range of the Southern Selkirk Mountains caribou population do not even support a viable population, and certainly must expand to achieve recovery.  FWS's attempt at dismissing the recovery objectives from the recovery plan as being outdated are unavailing.

FWS's reasoning also ignores the fact that habitat degradation is often the cause of a species' decline.  Indeed, FWS and other experts admit that the biggest past and ongoing threats to these caribou are habitat alteration and fragmentation from timber harvest, wildfire, and roads,

which can also lead to increased predation of caribou, as well as increased human access from recreation activity.  AR 8, 20, 28-31, 28775-76, 22432, 2447-50, 3435-40, 3442-45, 3530-34. Habitat modeling of the caribou recovery area shows substantial habitat in the Selkirk Mountains of Idaho, as well as potential movement corridors linking habitat within Idaho and between the U.S. and Canada.  AR 1877-78, 1927-32 (habitat modeling), 4001, 4028 (corridor modeling).  In fact, FWS has noted that the Kinley and Apps habitat model showed that "one of the largest blocks of high priority caribou habitat in the Selkirk Ecosystem is centered on [Idaho Department of Lands] property" and "is considered to contribute significantly to caribou habitat within the Selkirk Ecosystem."  AR 3532.

Yet, while much of the land within the caribou recovery area has the potential to be caribou habitat, far less than half of that is currently suitable for caribou use due to the threats discussed above.  AR 3435, 3543.  The ESA recognizes that habitat loss is often the cause of a species' decline, which is the very reason the ESA requires designation of critical habitat to achieve the goal of recovering a species.  The "preservation of a species' habitat is essential to the preservation of the species itself," and designation of critical habitat serves as "the principal means for conserving an endangered species, by protecting not simply the species, but also the ecosystem upon which the species depends."  *Ctr. for Biological Diversity v. Kempthorne*, 607 F. Supp. 2d at 1086 (quoting *Ctr. for Biological Diversity v. Norton,* 240 F. Supp. 2d at 1098, 1101).  FWS stated in the 5-year review that, although altered habitat may take years to return to suitable condition, "protection of such areas is imperative for long-term conservation" of mountain caribou.  AR 3431.  Simply because a species has declined and is no longer using

former habitat does not support the conclusion that the area is not essential for recovery.[1]

FWS itself disagreed with that conclusion just weeks before deciding to shrink the designation, stating in the draft final rule that even if some of the areas proposed for designation were not occupied by the species at the time of listing, "the determination that the areas being designated in this final rule are essential to the conservation of the species would still apply." AR 698.  The peer reviewers likewise agreed that the proposed critical habitat designation was sufficient for conservation of the species, and just suggested using the Kinley and Apps and Wakkinen habitat and corridor analyses to refine the designation.  AR 22435, 22434, 22449-50, 22455, 22457, 22427-28, 22431.  These analyses showed a significant amount of caribou habitat and several movement corridors linking habitat throughout the Selkirk Mountains of Idaho.   AR 1877-78, 1927-32, 4001, 4028.

There is nothing in the record to support FWS's contention that areas formerly used by this caribou population are not essential for the its recovery when the record is clear that this population must expand in size and range to survive and recover.  In another case challenging the failure to designate unoccupied habitat, the court stated, "[t]here is no rational explanation for FWS's decision to limit a critical habitat designation to an area known to be failing in the recovery and survival of the species."  *Ctr. for Biological Diversity v. Army Corps. of Eng'rs,* Case No. 03-29-M-DWM, Order at 18.  The same is true here—there is no rational connection between the facts in the record and FWS's conclusion that no unoccupied lands are essential to

---

[1] FWS's claim that since 2001, caribou have only been observed near the border with Canada and thus have not used other parts of Idaho is not supported by the record.  AR 24.  Winter censuses and other verified sightings occurred in 2003, 2004, and 2007 at Lions Head, Two Mouth Lakes, and Ball Creek, all of which are along the Selkirk Crest east of Priest Lake.  AR 28791-94, 28665, 28654.  Numerous other anecdotal reports of caribou in that same area occurred from 2000-2008, which FWS considered in its 2008 biological opinion, but refused to consider in the final critical habitat rule.  AR 3538-39, 28.

the conservation of the species.

**2.     Reliance on Canadian lands**

FWS's second reason for not designating unoccupied habitat is that the 30,010 acres in the U.S. –  combined with areas in Canada that are being conserved for woodland caribou – meets the recovery plan objective of securing 443,000 acres of habitat for caribou in the Selkirk ecosystem.  AR 26.  FWS arbitrarily disavowed every other recovery plan objective by claiming the recovery plan was outdated, but then relied on this one objective to justify its decision.  AR 24, 26.  It does not explain why the recovery plan objectives to expand the population size and distribution no longer apply, but the objective to secure 443,000 acres of habitat does.  FWS's cherry-picking of this single objective is even more unreasonable given that it admits it does not know the basis of the 443,000-acre figure.  AR 662.

FWS's decision-making is also unreasonable because it made the decision to reduce critical habitat and not include any unoccupied areas before receiving specific information about the management of Canadian lands.  AR 23396-97 (Sept. 14 email and memo discussing revision of final rule), 23164 (Sept. 24 email noting need to get more information on Canadian lands), 23148 (Sept. 25 email from Canadian biologist discussing Canadian lands).  It is clear from these emails that FWS decided to use the Canadian lands rationale to try to justify its decision, and then sought out information it could use to support that rationale.  That process reflects post hoc rationalization, not well-reasoned analysis and decision-making.

It is also clear from the recovery plan that the intent of securing 443,000 acres of caribou habitat was not to have 95% of the habitat in Canada.  As FWS notes, the 443,000-acre figure comes from Table 2 on page 21 of the recovery plan, which identifies potential caribou habitat in the Selkirk ecosystem.  AR 23164, 662, 3203.  That Table identified 443,360 acres of caribou

habitat, broken down by ownership, with 331,150 acres (75%) in the U.S. and 112,210 acres (25%) in B.C.  AR 3203.  Likewise, the recovery area identified in the recovery plan covered 5,700 km$^2$ (1.4 million acres), with 53% in the U.S. and 47% in B.C.  AR 3186, 3241.  Based on the distribution of the recovery area and the distribution of caribou habitat in the Selkirk ecosystem identified in the recovery plan, relying on an area that is 95% in B.C. does not meet the intent of the recovery plan.

Moreover, reliance on management of these Canadian lands does not negate the need to designate lands in the U.S. because it is not the functional equivalent of critical habitat.  *Natural Res. Def. Council,* 113 F.3d at 1127 (state management plan was not functional substitute for critical habitat and did not negate need for designation); *Ctr. for Biological Diversity v Norton*, 240 F. Supp. 2d at 1100-03 (existence of other management plans and habitat protections did not relieve FWS of duty to designate critical habitat); *Ctr. for Biological Diversity v. Kempthorne,* 607 F. Supp. 2d at 1091 n.11 (other significant protection for species not valid reason for non-designation of critical habitat).

The only information in the final rule is that Canada has protected 282,515 acres of Crown Lands from further timber harvest and The Nature Conservancy purchased about 135,908 acres of land and halted all logging activity.  AR 26.  It does not state how much of that land is caribou habitat or whether it contains the primary constituent elements essential for recovery, nor does it say anything about other threats to caribou, such as roads, human access, or predation on those lands.  *Id.*  Canadian lands obviously are not subject to the ESA and therefore activities on those lands would not have to undergo ESA consultation to assess their impacts to caribou habitat, nor would they be subject to enforcement actions for violations of the ESA.  Because the management of Canadian lands is not functionally equivalent to critical habitat protections, FWS

cannot rely on that to show its minimal designation in the U.S. is sufficient to conserve the species. *Natural Res. Def. Council*, 113 F.3d at 1127; *Ctr. for Biological Diversity v. Norton*, 240 F. Supp. 2d at 1100-03.

Finally, there is no support in the record to show that management of Canadian lands plus the small amount of critical habitat in the U.S. is sufficient to recover the Southern Selkirks caribou population. Because FWS does not even know where the 443,000-acre figure came from, and provides no other information to show that the area concerned will provide for recovery of caribou, reliance on this single objective in its final rule is arbitrary and capricious. AR 662, 26. Furthermore, management of lands in Canada has not allowed for recovery of mountain caribou. The Southern Selkirk Mountains caribou population has continued to decline, and most other mountain caribou populations in Canada are also declining, with ten of them at less than fifty animals, resulting in the entire global population being at risk of extirpation. AR 3424, 23122.

Canadian biologists also acknowledge that status quo management will lead to a continuing decline of mountain caribou, subpopulations will continue to get smaller and ranges will continue to retreat. AR 2508. One report notes that the effort required for successful recovery might be higher for the southern populations than elsewhere because the threats from human activities are greater. *Id.* FWS's 5-year review for the Southern Selkirk Mountains population emphasized the importance of this particular population, stating that "[a]s the southernmost mountain caribou population and the last remaining population within the US, the South Selkirk population takes on added significance in maintaining the shrinking range of mountain caribou, which has already decreased 60% from the historic range. Further range contraction, combined with decreasing population numbers, could have serious implications to

the conservation of mountain caribou." AR 3424.  These statements do not indicate that
management of lands in Canada is successful at recovering caribou.

In sum, FWS's leap to conclude that the majority of the habitat essential to the
conservation of species occurs in Canada, and that Canadian lands are sufficient to recover the
species, is not rational or supported by the record.  FWS's theory that the U.S. habitat is not
essential for recovery is based on the fact that the size and range of this caribou population has
declined so much, it is not using habitat in the U.S. any longer.  AR 26, 27.  Under this absurd
reasoning, the more a species declines, the less protection it gets.  What this fails to take into
account is an analysis of what is actually needed for recovery, and whether the limited area
designated is sufficient for recovery.  There is no evidence in the record that protecting just that
small area is sufficient for recovery and in fact, all of the evidence shows it is not.  Thus, FWS
has not articulated a rational connection between the facts and its conclusions in the final critical
habitat rule, rendering it unlawful.  *Arizona Cattle Growers*, 606 F.3d at 1163; *Natural Res. Def.
Council*, 113 F.3d at 1124.

**B.  The Final Critical Habitat Rule Violated the Procedural Requirements of the
ESA and APA by Failing to Provide for Public Notice and Comment on the
Substantially Revised Designation.**

The second reason the final critical habitat designation is unlawful is because it violates
the ESA's and APA's procedural requirements.  A final agency action is unlawful if it was taken
"without observance of procedure required by law."  5 U.S.C. § 706(2)(D).  Both the APA and
ESA require that agencies give the public notice and opportunity to comment on ESA proposed
rules, including critical habitat designations.  16 U.S.C. § 1533(b)(4), (b)(5); 5 U.S.C. § 553(b)-
(c); 50 C.F.R. § 424.16(c); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1402 (9th Cir.
1995); *Ctr. for Biological Diversity v. BLM*, 422 F. Supp. 2d at 1155.

Such requirements mandate that FWS provide the public with all of the necessary information upon which it based its decision so that the public can make informed comments. Failing to make available to the public during the comment period key reports, studies, or management plans that were discussed and relied upon in the final rule violates the notice and comment requirements of the ESA and APA. *Idaho Farm Bureau,* 58 F.3d at 1402-04; *Ctr. for Biological Diversity v Norton*, 240 F. Supp. 2d at 1105-08. Furthermore, a final rule that deviates substantially from a proposed rule also violates the notice and comment requirements if the final rule is not in character with the original proposal and a "logical outgrowth" of the notice and comments received. *Rybachek v. EPA*, 904 F.2d 1276, 1287-88 (9th Cir. 1990); *Natural Res. Def. Council v. EPA*, 279 F.3d 1180, 1186 (9th Cir. 2002). "The essential inquiry focuses on whether interested parties reasonably could have anticipated the final rulemaking from the draft." *Natural Res. Def. Council,* 279 F.3d at 1186.

Here, FWS violated the ESA's and APA's procedural requirements because it did not fairly provide notice and opportunity for public comment on the final rule. While a final rule may obviously change from a proposed rule, the change here was so drastic and not a logical outgrowth of the notice and comments given on the proposed rule that FWS failed to provide an adequately opportunity for the public to be heard regarding those changes. The reduction of critical habitat by more than 90% and the reasoning given in the final rule for the final designation was not something that interested parties reasonably could have anticipated from the proposed rule. *Id.* Although FWS asserts in the final rule that the change in the determination of what was occupied habitat stemmed in part from peer review and public comment, AR 2, FWS's decision to completely eliminate 90% of the critical habitat it had determined in the proposed rule was essential for the conservation of the species was not forecast anywhere in the proposed

rule nor subject to comment.

Even after changing its determination about occupied habitat, FWS could have designated unoccupied habitat and ended up with a final designation that did not substantially deviate from the proposed rule.  Instead, it ended up with a final designation that covered only a small fraction of caribou habitat in Idaho, none of which occurred along the Selkirk Crest or on state or private land.  AR 34, 42, *cf.* AR 28779, 28786.  Neither the public nor the peer reviewers had a chance to comment on whether this drastically reduced area is sufficient to recover the species.  Indeed, none of the peer reviewers indicated that the larger geographic area was not necessary for recovery, and in fact two of them recommended that FWS should apply the Kinley and Apps habitat modeling and Wakkinen movement corridor modeling to the analysis, which showed substantial habitat and movement corridors throughout the Selkirk Mountains in Idaho, including on state lands.  AR 22434, 22435, 22427-31, 22450, 22457 (peer reviews), 1927-32 (habitat suitability maps), 4028 (corridor map).  There was certainly no indication in the proposed rule that FWS might reduce the critical habitat by such a large degree, no suggestion by any of the peer reviewers that such a small area would be sufficient to recover the species, and thus no way to anticipate the final designation from the proposed rule.

Furthermore, FWS's reasoning to support its conclusion that no unoccupied habitat was essential for the conservation of the species was based on new theories that were not a logical outgrowth of the proposed rule.  FWS concluded that the significantly smaller critical habitat designation was sufficient for conservation of the species because of the decline of mountain caribou across its range, particularly the decline of the Southern Selkirks population, the conservation of lands in Canada, and the allegedly outdated nature of the recovery plan.  AR 23-27.  None of these factors was discussed in the proposed rule as reasons for not designating

critical habitat in the U.S.  Rather, the proposed rule emphasized the imperiled nature of this population of caribou, stated that the proposed designation would support the conservation objectives in the recovery plan and highlighted the need to expand geographic distribution of the population for recovery, and noted that more than half of the suitable and potential habitat for this species is in the U.S.  AR 28769, 28772-73.  It did not ever mention management of Canadian lands negating the need for critical habitat in the U.S.  In sum, the excuses FWS provided for its drastic reduction of critical habitat were newly put forth in the final rule, and in fact contradicted statements it made in the proposed rule, and thus were not a logical outgrowth of the proposed rule.  Because the public and peer reviewers never had an opportunity to comment on this new reasoning or the substantially smaller designation, the final rule violated the procedural notice and comment requirements of the ESA and APA.

Finally, FWS relied on management of Canadian lands for conservation of caribou to conclude that little land in the U.S. was necessary, but did not discuss or make the management plans for those Canadian lands available to the public for commenting.  AR 26.  FWS simply described in the final rule the amount of land owned by the Canadian Government or The Nature Conservancy that was protected from timber harvest to conserve woodland caribou based on personal communications with a Canadian biologist.  *Id.*  FWS provided no further information about the management of these lands, and did not make the management plans available to the public.  Despite not providing any additional information about the extent of protections for caribou on these lands other than lack of logging, FWS concluded that adding these Canadian lands to the 30,010 acres of critical habitat in the U.S. met the recovery plan's objective to secure 443,000 acres of habitat and thus was sufficient to support a recovered population of caribou.  AR 26-27.  The failure to provide information about the management plans for these Canadian

lands and make the plans available to the public for comment when FWS relied heavily on the

management of these lands in its final rule violated the ESA's and APA's procedural

requirements.  *Idaho Farm Bureau,* 58 F.3d at 1403-04 (failure to make U.S. Geological Survey

report, which FWS relied upon in final listing rule, available to the public violated ESA and

APA); *Ctr. for Biological Diversity v. Norton*, 240 F. Supp. 2d at 1106-08 (failure to make

management plan for Tribal lands available for public comment when FWS relied on plan in

critical habitat rule violated ESA and APA).  Because of these multiple procedural deficiencies,

the final critical habitat rule violated the APA and must be set aside.  5 U.S.C. § 706(2)(D).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant summary

judgment in their favor and reverse and remand the final critical habitat designation for the

Southern Selkirk Mountains population of woodland caribou.

Dated:  May 23, 2014                                          Respectfully submitted,


 s/Lauren M. Rule
Lauren M. Rule (ISB #6863)
ADVOCATES FOR THE WEST
3115 NE Sandy Blvd., Suite 223
Portland, OR 97232
(503) 914-6388
lrule@advocateswest.org

Jason C. Rylander (DCB #474995)
DEFENDERS OF WILDLIFE
1130 17th Street, NW
Washington, DC 20036
(202) 772-3245
jrylander@defenders.org

Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of May 2014, I electronically filed the foregoing PLAINTIFFS' OPENING BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, with the Clerk of the Court using the CM/ECF system, which sent a Notice of Electronic Filing to the counsel of record listed below:

Bradley H. Oliphant
bradley.oliphant@usdoj.gov

Paul A. Turcke
pat@msbtlaw.com

Caroline Lobdell
clobdell@wrlegal.org

Julie Weis
jweis@hk-law.com

William K. Barquin
wbarquin@kootenai.org

Samuel J. Eaton
sam.eaton@osc.idaho.gov

Jason C. Rylander
jrylander@defenders.org

s/Lauren M. Rule
Lauren M. Rule