UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, DEFENDERS OF WILDLIFE, CONSERVATION NORTHWEST, IDAHO CONSERVATION LEAGUE, SELKIRK CONSERVATION ALLIANCE, and THE LANDS COUNCIL, <br><br> Plaintiffs, <br><br> v. <br><br> BRIAN KELLY, U.S. Fish and Wildlife Service Idaho State Supervisor, and U.S. FISH AND WILDLIFE SERVICE, <br><br> Defendants. | Case No. 1:13-CV-00427-EJL-CWD <br><br> **MEMORANDUM DECISION AND ORDER** |

Pending before the Court in the above-entitled matter are the Cross-Motions for Summary Judgment filed by the parties in this environmental case. The matters have been fully briefed and are ripe for the Court's consideration. Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, the Motions shall be decided on the record before this Court without a hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs, Center for Biological Diversity, Defenders of Wildlife, Conservation Northwest, Idaho Conservation League, Selkirk Conservation Alliance, and The Lands Council, have brought this action against the Defendants, the United States Fish and Wildlife Service ("FWS") and Michael Carrier,[1] in his capacity as Idaho State Supervisor. Plaintiffs challenge the FWS' November 28, 2012 Final Rule designating 30,010 acres in Idaho and Washington as critical habitat for the southern Selkirk Mountains population of woodland caribou ("Selkirk Mountains Caribou") under the Endangered Species Act ("ESA"). Others have intervened as parties in this action: Kootenai Tribe of Idaho, Boundary County, Governor C.L. "Butch" Otter, Bonner County, and the Idaho State Snowmobile Association, Inc. (collectively "Defendant-Intervenors").[2]

In 1983, the Selkirk Mountains Caribou was emergency listed as "endangered" under the ESA. The final rule listing the Selkirk Mountains Caribou as endangered was entered in 1984 and the species has retained that status since that time.[3] Thereafter, FWS prepared and approved a Management Plan/Recovery Plan for the species which was

---

[1] Plaintiffs originally named Brian Kelly who has since retired. Michael Carrier now holds the position as United States FWS Idaho State Supervisor and is therefore substituted in pursuant to Federal Rule of Civil Procedure 25(d).

[2] In this Order, the Court has referred to the "Defendants" collectively and, at times, the FWS in particular.

[3] The FWS recently determined that a revision to this listing is appropriate and proposed amending the current listing to define the Selkirk Mountains Caribou as a part of the larger Southern Mountain Caribou Distinct Population Segment and designating that population as "threatened" under the ESA. (Dkt. 51 at 4-5 n. 3) (Dkt. 55 at 2-3.)

revised in 1994 ("1994 Recovery Plan"). (Dkt. 51 at 7.) On April 11, 2006, the FWS published a notice of intention to conduct a five-year review for several species including the Selkirk Mountains Caribou. (Dkt. 51 at 7-8.) That review was completed on December 5, 2008 wherein the FWS determined that the recovery criteria in the 1994 Recovery Plan were inadequate and no longer the best available information on the species and its habitat. (Dkt. 51 at 8.) The anticipated revised recovery plan has not yet been finalized. (Dkt. 51 at 8.)

On December 6, 2002, the FWS was petitioned to designate critical habitat for the Selkirk Mountains Caribou. On November 30, 2011, the FWS published a Proposed Rule seeking to designate approximately 375,562 acres as critical habitat in Boundary and Bonner Counties in Idaho and Pend Oreille County in Washington (the "Proposed Rule"). (AR28768.) In August of 2012, the FWS created a Draft Final Rule proposing to designate 227,100 acres of critical habitat. (AR00671-72.) The difference in acres between the Proposed Rule and the Draft Final Rule was the result of a change in the base habitat elevation from 4,000 to 5,000 feet in elevation. (AR00032-33 and AR00667.)

On November 28, 2012, the FWS published its final critical habitat designation ("Final Rule") for the southern Selkirk Mountains Caribou designating 30,010 acres of critical habitat. (AR00001-42.)[4] This change in total area designated in the Final Rule results, in part, from the FWS revised determination of the geographic area of occupied

---

[4] An October 12, 2012 FWS's memo (AR00657-61) and later draft final rule from November 14, 2012 (AR00464-65) both reflect the changed designation to 30,010 acres which was the amount ultimately adopted in the Final Rule. (AR00002.)

habitat for the species and its decision to not designate any unoccupied areas. (AR0009, 23-26.)

Plaintiffs have brought this action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*., alleging the Defendants' violated the ESA, 16 U.S.C. § 1531 *et seq*, in its Final Rule designation. (Dkt. 1.) Defendants maintain their decisions and actions fully complied with the applicable standards and requirements of the ESA. (Dkt. 25.) The Intervenors likewise argue that the Final Rule satisfies the requirements of the ESA and APA. (Dkt. 34, 49, 50, 55, 61, 62.) The parties have filed Cross Motions for Summary Judgment which the Court has taken up in this Order and finds as follows. (Dkt. 38, 49, 51.)

## STANDARD OF REVIEW

Compliance with ESA is reviewed under the APA's arbitrary or capricious standard. *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2010); 5 U.S.C. § 706(2)(A). Section 706(2)(A) of the APA provides that an agency action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Northwest Ecosystem Alliance v. U.S. Fish and Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (quoting 5 U.S.C. § 706(2)(A)). An agency decision is arbitrary or capricious if:  1) the agency entirely failed to consider an important aspect of the issue; 2) the agency offered an explanation for its decision that was counter to the evidence before it; 3) the agency relied on factors that Congress did not intend for it to consider; or 4) the agency's decision is so implausible that it could not

be ascribed to the product of agency expertise. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Under this standard, the Court will "'sustain an agency action if the agency has articulated a rational connection between the facts found and the conclusions made.'" *San Luis & Delta-Mendoa Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014) (quoting *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Rec.*, 426 F.3d 1082, 1090 (9th Cir. 2005)). Review under the arbitrary and capricious standard "is narrow, and [we do] not substitute [our] judgment for that of the agency." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (citations omitted); *Independent Acceptance*, 204 F.3d at 1251 (citations and quotations omitted) ("Our task is simply to ensure that the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made."). "Within this narrow review, [the court] cannot substitute [its] judgment for that of the [agency], but instead must uphold the agency decisions so long as the agencies have 'considered the relevant factors and articulated a rational connection between the facts found and the choice made.'" *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 954 (9th Cir. 2003) (citations omitted). This standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Independent Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000) (citations omitted).

Thus, under the arbitrary and capricious standard of review, the Court's "proper role is simply to ensure that the Forest Service made no 'clear error of judgment' that would render its action 'arbitrary and capricious.'" *McNair*, 537 F.3d at 993 (citations

omitted). Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Wildland CPR, Inc. v. U.S. Forest Serv.*, 872 F.Supp.2d 1064, 1075 (D. Mont. 2012) (citations omitted). In reviewing that explanation, the court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (citations omitted).

"Even when an agency explains its decision with 'less than ideal clarity,' a reviewing court will not upset the decision on that account 'if the agency's path may be reasonably discerned.'" *Alabama Dep't of Envt'l Conservation v. E.P.A.*, 540 U.S. 461, 497 (2004) (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Syst.*, 419 U.S. 281, 286 (1975)). "It is not the reviewing court's task to 'make its own judgment about' the appropriate outcome." *San Luis & Delta-Mendota*, 776 F.3d at 994 (quoting *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010)). "Congress has delegated that responsibility to" the agency. *Id.* "The court's responsibility is narrower: to determine whether the" agency complied with the procedural requirements of the APA. *Id.*

Judicial review of administrative agency decisions under the APA is based on the administrative record compiled by the agency—not on independent fact-finding by the district court. *Camp v. Pitts*, 411 U.S. 138, 142 (1973). In making this determination, the Court "may not consider information outside of the administrative record...and may not substitute our judgment for that of the agency." *Independent Acceptance*, 204 F.3d at 1251 (citations and quotations omitted). Courts may resolve APA challenges via

summary judgment. *See Nw. Motorcycle Ass'n v. United States Dep't Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a).

## ANALYSIS

Plaintiffs claim alleges two violations of the ESA: 1) the Final Rule's critical habitat designation is arbitrary and capricious because the Defendants failed to explain how the limited amount of critical habitat designated is sufficient to recover this population of caribou and 2) the Defendants failed to provide public notice and comment on the substantially revised critical habitat designation before issuing the Final Rule. (Dkt. 38 at 13.) The Defendants and Intervenors maintain that the FWS satisfied the requirements of the ESA and the Court should uphold the Final Rule's critical habitat designation. (Dkt. 49-52, 55, 60, 61, 62.)[5]

## 1. Critical Habitat Designation

The ESA was enacted "to protect and conserve endangered and threatened species and their habitats." *National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 651 (2007).[6] Such conservation efforts are made under the ESA by listing those

---

[5] There are many similarities in the arguments presented in the Defendants' briefs. While the Court may not cite to each of the Defendants' briefs on every issue raised in these motions, the Court has reviewed all of the parties' briefing in this action and considered the same in ruling on the Motions for Summary Judgment.

[6] The purposes of the ESA are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to

species who meet the definition of being either "endangered" or "threatened." 16 U.S.C. §§ 1532(6), (20) and § 1533(a)(1). When listing a species under the ESA, "to the maximum extent prudent and determinable," the FWS shall also "concurrently ... designate any habitat of such species which is then considered to be critical habitat." 16 U.S.C. § 1533(a)(3)(A). "Critical habitat" is defined under the ESA as:

> (i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

> (ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A). Such a designation "triggers mandatory consultation requirements for federal agency actions involving critical habitat." *Natural Resources Defense Council v. U.S. Dept. of the Interior*, 113 F.3d 1121, 1127 (9th Cir. 1997). Critical habitat designations are to be made "on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2).

After identifying the geographic area that meets this two-pronged definition, the Service may nonetheless exclude certain portions of that area "if [it] determines that the

---

take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section." 16 U.S.C. § 1531(b).

benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless ... the failure to designate such area as critical habitat will result in the extinction of the species concerned." 15 U.S.C. § 1533(b)(2). The FWS has significant discretion in determining whether to exclude particular areas. *See* 16 U.S.C. § 1533(b)(2). Thus, the critical habitat designation generally involves three steps:

> (1) identifying those areas occupied by the species that contain the features essential to the species' survival, (2) determining if any areas unoccupied by the species are essential for the conservation of the species, and then (3) excluding from these two areas any portions where the benefits of exclusion outweigh the benefits of inclusion, so long as such exclusion will not result in the species' extinction.

*Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.*, No. 5:09-cv-90, 2011 WL 73494, at *2 (C.D. Cal. Jan. 8, 2011). This designation is further governed by regulations requiring the FWS to "focus on the principal biological or physical constituent elements within the defined area that are essential to the conservation of the species." 50 C.F.R. § 424.12(b).[7] These "principal constituent elements" ("PCEs") "may include, but are not

---

[7] In determining critical habitat areas, ESA regulations require the FWS to consider

> those physical and biological features that are essential to the conservation of a given species and that may require special management considerations or protection. Such requirements include, but are not limited to the following:
> (1) Space for individual and population growth, and for normal behavior;
> (2) Food, water, air, light, minerals, or other nutritional or physiological requirements;
> (3) Cover or shelter;
> (4) Sites for breeding, reproduction, rearing of offspring, germination, or seed dispersal; and generally,
> (5) Habitats that are protected from disturbance or are representative of the historic geographical and ecological distributions of a species.

limited to, the following: roost sites, nesting grounds, spawning sites, feeding sites, seasonal wetland or dryland, water quality or quantity, host species or plant pollinator, geological formation, vegetation type, tide, and specific soil types." *Id.*

## A. Critical Habitat Sufficient to Recover the Species

Plaintiffs assert the FWS failed to adequately explain how the limited amount of critical habitat designated in the final rule is sufficient to recover this population of caribou. Plaintiffs' claim is based on their contention that the purpose of critical habitat and the ESA are to recover the endangered species. (Dkt. 38 at 13) (Dkt. 57 at 2, 5.) Defendants' dispute that the ESA requires designation of sufficient critical habitat to guarantee, by itself, the recovery of the species. (Dkt. 51 at 25) (Dkt. 55 at 8) (Dkt. 60 at 5.) Defendants instead argue that the ESA's recovery requirement for the listing determination is not applicable to the critical habitat designation. (Dkt. 6-7.) Further, Defendants argue, a greater showing is required to designate unoccupied areas as critical habitat as opposed to occupied areas. (Dkt. 60 at 6.)

_____

When considering the designation of critical habitat, the Secretary shall focus on the principal biological or physical constituent elements within the defined area that are essential to the conservation of the species. Known primary constituent elements shall be listed with the critical habitat description. Primary constituent elements may include, but are not limited to, the following: roost sites, nesting grounds, spawning sites, feeding sites, seasonal wetland or dryland, water quality or quantity, host species or plant pollinator, geological formation, vegetation type, tide, and specific soil types.

50 C.F.R. § 424.12(b).

Resolution of this issue turns on the FWS's interpretation of the ESA. In reviewing an agency's interpretation of a statute that it administers, the Court employs the two-step analysis set forth in *Cheveron U.S.A. v. Natural Resorces Def. Council, Inc.*, 467 U.S. 837, 847-48 (1984). Under that framework, the Court first considers "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. Here, the Court finds the Defendants' interpretation that its critical habitat designation need not "prove" that it will "ensure" the recovery of the species is contrary to the plain language and purpose of the ESA. (Dkt. 60 at 5.)

"Congress enacted the Endangered Species Act ("ESA") in 1973 'to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved.'" *Trout Unlimited v. Lohn*, 559 F.3d 946, 949 (9th Cir. 2009) (quoting 16 U.S.C. § 1531(b)). "The ESA's 'primary purpose ... is to prevent animal and plant species endangerment and extinction caused by man's influence on ecosystems, and to return the species to the point where they are viable components of their ecosystems.'" *Id.* (quoting H.R. Rep. No. 95–1625, at 5 (1978), reprinted in 1978 U.S.C.C.A.N. 9453, 9455). Congress enacted the ESA "to protect and conserve endangered and threatened species and their habitats." *National Ass'n of Home Builders*, 551 U.S. at 651. "'[T]he purpose of establishing critical habitat is for the government to carve out territory that is

not only necessary for the species' survival but also essential for the species' recovery.' Thus, [the] FWS [must] be more generous in defining area as part of the critical habitat designation.'" *Home Builders Ass'n of Northern Cal. v. U.S. Fish and Wildlife Serv.*, 616 F.3d 983, 989 (9th Cir. 2010) (quoting *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004)).[8]

> The designation of critical habitat is the principal means for conserving an endangered species, by protecting not simply the species, but also the ecosystem upon which the species depends. In fashioning the ESA, it was Congress' understanding that the preservation of species' habitat is essential to the preservation of the species itself.

*Center for Biological Diversity v. Kempthorne*, 607 F.Supp.2d 1078, 1086 (D. Ariz. 2009) (internal citations and quotations omitted).

Critical habitat is defined and designated "in relation to areas necessary for the conservation of the species, not merely to ensure its survival." *Arizona Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1166 (9th Cir. 2010); *see also Gifford Pinchot*, 378 F.3d

---

[8] *Gifford Pinchot* was a Section 7 ESA case involving a challenge to the FWS's interpretation of "adverse modification," 50 C.F.R. § 402.02. *Gifford Pinchot*, 378 F.3d at 1069. There, the Ninth Circuit concluded that the regulatory definition of "adverse modification" was inconsistent with the purpose of the ESA to establish critical habitat not only for the survival of a listed species but also for that species' conservation and recovery. *Id.* at 1069-71. The Defendants argue *Gifford Pinchot* is irrelevant because this case raises the critical habitat designation requirements found in Section 4 of the ESA, not Section 7's adverse modification provision. (Dkt. 60 at 8.) By citing to *Gifford Pinchot* here, the Court is not imposing Section 7's consultation requirements on the FWS's critical habitat designation made under Section 4. Instead, the Court finds instructive *Gifford Pinchot's* discussion regarding the ESA's use of the term conservation as applied to critical habitat designations of listed species as demanding more than mere survival of the species; i.e., conservation means using methods and procedures necessary to bring a species to the point where listing is no longer required. *Id.* Under that definition as used in the ESA, conservation necessarily encompasses recovery. *See* 16 U.S.C. § 1532(3).

at 1070 (discussing the difference between conservation and survival). In this context, conservation means "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." 16 U.S.C. § 1532(3), (5)(A). Thus, the whole point behind designating critical habitat is to identify those physical and biological features of the occupied area and/or those unoccupied areas that are essential to the conservation of a species with the aim of arriving at the point where the species is recovered, i.e., no longer in need of the measures provided for in the ESA. *See* 16 U.S.C. § 1532(3); *see also Arizona Cattle Growers*, 606 F.3d at 1166 (The purpose of the ESA "'to prevent animal and plant species endangerment and extinction caused by man's influence on ecosystems, and to return the species to the point where they are viable components of their ecosystems.'") (quoting *Trout Unlimited*, 559 F.3d at 949 (quoting H.R. Rep. No. 95-1625, at 5 (1978), reprinted in 1978 U.S.C.C.A.N. 9453, 9455)). Failing to make such designations with that aim in mind is arbitrary and capricious. Because the Defendants' interpretation of the ESA's critical habitat designation is contrary to both the plain language and a permissible construction of the statute, the Defendants are entitled to no deference here. *See Center for Biological Diversity v. Norton*, 240 F.Supp.2d 1090, 1100 (D. Ariz. 2003) (citing *Chevron*, *supra*).

The Court recognizes the distinction between the ESA's requirements for the recovery plan as opposed to those applicable to critical habitat designations. *Home Builders*, 616 F.3d at 989-90 (The "ESA does require a determination of criteria for measuring when a species will be conserved, but that requirement applies to the

preparation of a recovery plan.") (citing 16 U.S.C. § 1533(f)(1)(B)(ii)); *see also Aina Nui Corp. v. Jewell*, 2014 WL 4905076, at *10 (D. Hawai'i Sept. 30, 2014) (discussing the distinction between a critical habitat designation and the recovery planning requirements.). The plain language and structure of the ESA provides that the requirement for designating critical habitat (16 U.S.C. § 1533(a)(3)) is separate from the requirement for preparing a recovery plan (16 U.S.C. § 1533(f)). This distinction does not, however, change the fact that the critical habitat designation language in the ESA is intended to ensure "conservation" of the species.

Although the ESA does not require that FWS identify specific recovery criteria at the time of the designation, the ESA's critical habitat designation still requires a determination of what physical or biological features are "essential to the conservation of the species" even if it does not know precisely how or when recovery of a viable population will be achieved. *Home Builders*, 616 F.3d at 989 (citing 16 U.S.C. § 1532(5)(A)) (rejecting argument that FWS must first identify the point at which the endangered species is considered conserved before it designates critical habitat.); *Arizona Cattle Growers*, 534 F.Supp.2d at 1025 ("While tempting in its logical simplicity...the language of the ESA requires a point of conservation to be determined in the recovery plan, not at the time of critical habitat designation."). That determination necessarily encompasses identifying features that will achieve the ESA's purpose of conservation which is recovery of the species to the point that the ESA's protective measures are no longer needed. 16 U.S.C. § 1532(3). Thus, under the ESA the FWS is required to designate areas with the necessary features to promote that purpose. This is evident not

only from the express language of the ESA but also the intent behind the legislation. The question in this case then is whether or not the Defendants have properly designated critical habitat "essential to the conservation" of the Selkirk Mountains Caribou. 16 U.S.C. § 1532(5)(A).

## B.    Rational Basis for the Final Rule Critical Habitat Designation

Defendants argue that the Final Rule's critical habitat designation is rationally based on the best available scientific data. (Dkt. 51 at 11) (Dkt. 60 at 2-5.) Plaintiffs counter that the decision is arbitrary and capricious because it fails to explain how the critical habitat determination provides for recovery of the species. (Dkt. 38 at 13.) In particular, Plaintiffs claim the Final Rule does not explain a rational connection as to 1) the decision to limit the designation to occupied habitat and 2) reliance on Canadian lands and management. (Dkt. 38 at 19-28.)

### 1.    Occupied and Unoccupied Habitat

"Under ESA § 3(5)(A), an area constitutes 'critical habitat' if it meets the requirements for occupied habitat or for unoccupied habitat." *Home Builders*, 616 F.3d at 990 (citing 16 U.S.C. § 1532(5)(A)). The standard for designating unoccupied habitat is more demanding than that of occupied critical habitat. *Id.* "The statute thus differentiates between 'occupied' and 'unoccupied' areas, imposing a more onerous procedure on the designation of unoccupied areas by requiring the Secretary to make a showing that unoccupied areas are essential for the conservation of the species." *Arizona Cattle Growers*, 606 F.3d at 1163. "[W]hen an agency is acting within its expertise to make a

scientific determination a reviewing court must generally be at its most deferential." *Id.* at 1167 (citations and quotations omitted).

The Final Rule designates 30,010 acres of occupied land as critical habitat for the Selkirk Mountains Caribou; a reduction of approximately 345,522 acres from the Proposed Rule's designation. (AR00002.) Both the Final Rule and the Proposed Rule concluded that "there were no areas within the United States outside the geographical area occupied at the time of listing that are essential to the conservation of the species." (AR00027) (AR28773.) In redefining the occupied area, the FWS stated it applied the best available scientific data including reevaluating surveys, census monitoring data, information and literature, and caribou observations. (AR00002.) This reassessment of the geographic area of occupation generally resulted in the conclusion that the species' area of occupation in the United States was significantly less than presented in the Proposed Rule. (AR00027.) For instance, the FWS noted the "anecdotal reports of caribou sightings" do not satisfy the best available scientific data standard and have not been considered. (AR00028.) Final Rule then goes on to identify the physical or biological features essential to the conservation of the species. (AR00028-30.) Ultimately the Final Rule "determined that there are no areas within the United States outside the geographical area occupied at the time of listing that are essential to the conservation of the species" and designates "as critical habitat lands that [the FWS has] determined are occupied at the time of listing and contain sufficient PBFs to support life-history processes essential for the conservation of the southern Selkirk Mountains population of woodland caribou." (AR00027, 33.)

Plaintiffs challenge that this reasoning is arbitrary and capricious because the decline of the species should not form the basis for not designating unoccupied habitat. (DKt. 38 at 20.) Limiting critical habitat to the occupied area, Plaintiffs also argue, will not allow for recovery of the species and is contrary to the purpose of the ESA. Plaintiffs further challenge the science relied upon by FWS in the Final Rule used to make this determination arguing there is no basis given to support the FWS's contention that the areas formerly used by the caribou are not essential to its recovery. (Dkt. 38 at 22.) Defendants maintain the best available science was used in making the Final Rule's critical habitat determination. (Dkt. 50 at 6-8) (Dkt. 51 at 11-21) (Dkt. 61 at 4-11.)

This is a matter within the FWS's particular area of expertise that is entitled to great deference. *See Arizona Cattle Growers*, 606 F.3d at 1163-65. The Final Rule appears to articulate a rational connection between the facts and the scientific evidence relied upon by the FWS in determining the geographic occupancy area of critical habitat for the Selkirk Mountains Caribou. While the Final Rule's analysis seems reasonably based on the best available science, the Court does not make this determination conclusively at this time in light of the ruling below concerning the procedural requirements necessitating a further public review and comment period.

As to Plaintiffs' argument challenging the determination that unoccupied areas were not essential to the species, the Defendants contend that because the occupied critical habitat designation was determined to contain sufficient PBFs to support life-history processes essential for the conservation of the [species] that there was no basis to designate unoccupied habitat. (Dkt. 51 at 22) (Dkt. 61 at 4-11.) Moreover, Defendants

point out that the FWS did consider unoccupied areas and determined they were not essential to the conservation of the species. (Dkt. 51 at 23.)

Again, designation of areas outside the geographic area occupied by the species as critical habitat necessitates a heightened finding that such areas are essential for the conservation of the species. *See Arizona Cattle Growers*, 606 F.3d at 1163-65; 16 U.S.C. § 1532(5)(A)(ii). The applicable regulation specifies that "[t]he Secretary shall designate as critical habitat areas outside the geographical area presently occupied by a species only when a designation limited to its present range would be inadequate to ensure the conservation of the species." 50 C.F.R. § 424.12(e).

The Final Rule discusses the FWS's reasoning underlying its designation of the geographical area of occupation by the Selkirk Mountains' Caribou. As noted above, this is a matter within the FWS's unique area of expertise and afforded great deference. If that reasoning was based on the best available science and the FWS's explanation of its determination that the occupied area was adequate to ensure the conservation of the species was reasonable, the FWS is not required to designate unoccupied areas as critical habitat. Again, the Court does not make this finding at this time.

The Court's discussion on this issue here is only preliminarily in light of the Court's determination below that Defendants violated the ESA's procedural public review and comment requirement. Because this matter will be remanded to the FWS for further proceedings to cure that procedural error, the Court's discussion in this section is intended only to provide assistance to the parties going forward but is not binding in any future proceedings.

### 2. Canadian Lands and Management

Plaintiffs also challenge the Final Rule's reliance on lands located in and managed by Canada as a basis for not designating more area as critical habitat in the United States. (Dkt. 38 at 25-28.) Defendants maintain that the designation of 30,010 acres in the United States coupled with the land Canada has protected are sufficient to provide for a self-sustaining caribou population and the total area exceeds the Recovery Plan's goals. (Dkt. 51 at 28.) The Defendants further represent that their consideration of Canadian lands was part of its "determination as to whether an areas not occupied at the time of listing were essential to the conservation of the species, such that they also met the definition of 'critical habitat.'" (Dkt. 51 at 29) (Dkt. 61 at 7-8.)

The Final Rule's discussion relying on the Canadian land was not similarly included in the Proposed Rule nor did it flow from the same reasoning. For the reasons sated in the following section of this Order, the Court finds the considerations relating to Canadian lands have not been subject to public review and comment as required by the ESA and APA. This matter will be remanded to the FWS with instructions for it to take action to correct that procedural shortcoming. Accordingly, the Court makes no ruling in regard to this material at this time.

### 2. Public Notice and Comment

Plaintiffs argue the Defendants violated the procedural requirements of the ESA and APA by failing to provide for public notice and comment on the substantially revised critical habitat designation made in the Final Rule. (Dkt. 38 at 28.) Defendants maintain

they were not required to provide an additional notice and comment period prior to issuing the Final Rule because they had already provided for extensive public commenting and the changes to the Final Rule were logical outgrowth of the Proposed Rule and within the ambit of the solicited topics and public comments such that the changes could have been anticipated. (Dkt. 51 at 31-35)[9] (Dkt. 50 at 3-6)(Dkt. 55 at 11-17) (Dkt. 61 at 2-4) (Dkt. 62 at 4-5.)

The ESA and APA require the FWS to provide the public with notice and to accept comment on any proposed listing or critical habitat designation. *See* 16 U.S.C. § 1536(b)(5)(A), 1533(b)(8); 5 U.S.C. § 553(b)-(c). The final rule need not, however, be identical to the proposed rule. "The law does not require that every alteration in a proposed rule be reissued for notice and comment." *Natural Resources Defense Council v. U.S. EPA*, 279 F.3d 1180, 1186 (9th Cir. 2002) (citation omitted). Yet, a "final rule which departs from a proposed rule must be a 'logical outgrowth' of the proposed rule." *Id.* at 1186; *see also Environmental Defense Center, Inc. v. U.S. EPA*, 344 F.3d 832, 851 (9th Cir. 2003). "The essential inquiry focuses on whether interested parties reasonably could have anticipated the final rulemaking from the draft." *Id.* (internal quotation and citation omitted). "In determining this, one of the salient questions is 'whether a new round of notice and comment would provide the first opportunity for interested parties to

---

[9] The Defendants point out that several rounds of public comment periods were held, along with numerous public meetings, and two public hearings. (Dkt. 51 at 32.) In addition, Defendants note that they solicited peer reviews and public comments specifically on the question of what areas were occupied at the time of listing. (AR00004-25.) The FWS received hundreds of public comments and four peer reviews on this issue.

offer comments that could persuade the agency to modify its rule.'" *Id.* (citations omitted). "The purpose of the notice and comment requirement is to provide for meaningful public participation in the rule-making process." *Idaho Farm Bureau Fed. v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995) (citation omitted).

The FWS is not required to reopen the comment period unless the information is critical. *Idaho Farm Bureau*, 58 F.3d at 1403 (citation omitted); *Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1074 (9th Cir. 2006). After the close of the comment period, the agency can add information that responds to comments on the proposed rulemaking, or "supplementary" data that "'expand[s] on and confirm[s]' information contained in the proposed rule[ ] and addresses 'alleged deficiencies' in the pre-existing data," provided no prejudice is shown. *Id.* at 1402.

In *Idaho Farm Bureau*, the Ninth Circuit concluded that the agency's reliance upon a USGS study that was not available to the public at the time the final listing decision was issued was critical to the agency's decision because the report "provided the only scientific information on the cause of decline in spring flows. The USGS study provided unique information that was not duplicated in other reports." *Idaho Farm Bureau*, 58 F.3d at 1403. Thus, the agency was required to "provide an opportunity for public comment on the final USGS report and reconsider the listing decision thereafter." *Id.* at 1404.

In *Kern County Farm Bureau*, on the other hand, the Ninth Circuit held that three post-comment period studies were not critical to the listing decision. There, the Ninth Circuit distinguished the circumstances from those found in *Idaho Farm Bureau* based on

the fact that "the new materials do not provide the sole, essential support for the listing decision." *Kern*, 450 F.3d at 1079. The Ninth Circuit found that because the studies in *Kern* "confirm and expand on existing data, providing additional grounds," and "did not alter the justifications or conclusions that were vital to the listing decision," they were not critical to the listing decision and agency was not required to reopen the public comment period. *Id.*

Here, Defendants maintain that the changes to the Final Rule could have been anticipated because the FWS explicitly solicited comments on the basis for the reduction and received several comments and peer reviews pointing out flaws in the FWS's approach taken in the Proposed Rule. (Dkt. 60 at 18) (Dkt. 55 at 14-15.) Plaintiffs counter that they could not have reasonably anticipated the "fundamental shift" in reasoning by the FWS leading to the Final Rule's determination that 375,562 acres in the United States were no longer essential for recovery of the species and that only 30,010 acres would now be designated as critical habitat. (Dkt. 57 at 17-18.) The Court agrees with Plaintiffs.

The Final Rule contains a lengthy discussion of the peer reviews and public comments received which prompted the FWS's reassessment as well as a section summarizing the changes from the Proposed Rule. (AR00002-27.) The Final Rule reveals that the FWS made a fundamental and dramatic change in reasoning based on materials not previously discussed or cited in the Proposed Rule. Those materials form the basis for the FWS's conclusion in the Final Rule that the critical habitat needed in the United States is only 30,010 acres because (1) the caribou population occupying habitat in the United States is much less than the studies relied on in the Draft Rule suggest, (2) the

caribou are occupying more habitat in Canada, and (3) Canada is managing its lands to protect the species. (AR00023-27.) The Court finds the reasoning underlying the Final Rule's habitat designation could not have been anticipated as it does not logically flow from the Draft Rule's reasoning. The new basis for the Final Rule's designation is the FWS's reevaluation of data from different materials as prompted in large part by four peer reviews. Further, the Court finds the materials underlying the reasoning in the Final Rule are not "supplemental" to the prior logic of the Proposed Rule.

In making its revised determination of the geographical area occupied by the species in the Final Rule, the FWS considered peer review comments as well as studies conducted by "Scott and Serveheen" and "DeGroot and Wakkinen." (AR00024-26.) These materials are the basis for the dramatic reduction in the size of the geographical area of occupation found in the Final Rule which were not discussed in the Proposed Rule. While both the Proposed Rule and the Final Rule recognized that the number of caribou in the United States had "dwindled" and that the bulk of the population primarily occupied habitat in Canada, the Proposed Rule still defined the geographic area occupied by the Selkirk Mountains Caribou as comprising some 375,562 acres in the United States based on the studies and materials reflecting that there exists at least a small population of the species in the United States. (AR00027) (AR28772, 2877-79.) Following periods of public commenting and receipt of the four peer reviews, the FWS "reevaluated" and "reassessed" its critical habitat designation in the Final Rule, changing its analysis of the geographical area occupied by the species which resulted in a significant reduction to the area proposed for designation based on materials not mentioned in the Proposed Rule.

(AR00002-5) (noting the Proposed Rule incorrectly equated occupancy with approximate area of utilization.) The Court does not fault the ultimate conclusion reached in the Final Rule on this issue. In fact, the Court agrees with the Defendants that the FWS can and should undertake such reassessments of its positions when presented with better scientific evidence. The Court appreciates the candor with which the FWS explained its change in analysis in the Final Rule. Such an unexpected and significant change in reasoning based on materials not previously discussed in the Proposed Rule, however, require an additional period of public review and comment.

As to the consideration of Canada's land management in particular, the Defendants counter that they did not rely "heavily" on those plans nor were they vital or of singular importance in arriving at its decision. (Dkt. 60 at 19.) The Defendants' maintain that Final Rule was instead based on the FWS's reevaluation of the best available science concerning lands in the United States based on the research identified by the peer reviewers and public comments. (Dkt. 61 at 2-3.) Thus, the management plans were merely additional supporting documentation regarding relevant lands that the FWS knew to be managed in Canada. (Dkt. 55 at 15-16.)

The Court finds the materials showing greater numbers of the species in Canada are in some respects similar to the FWS's finding in both the Final Rule and the Proposed Rule that caribou are occupying more habitat in Canada than in the United States. The procedural problem here, however, is the Final Rule's reasoning relying upon the Canadian management of caribou habitat as a basis for its rational to reduce the amount of critical habitat designated in the United States. Had these materials simply been more

current data of occupation numbers they would be supplemental to the reasoning expressed in the Proposed Rule. The Final Rule, however, used these materials to support, at least in part, its new reasoning that the protected Canadian lands are sufficient critical habitat for the species and, therefore, significantly less critical habitat need be designated in the United States. Recognizing that the caribou are occupying more land in Canada is one thing. Relying on protected Canadian lands as a basis for overhauling the amount of occupied habitat proposed for designation in the United States was a new and unanticipated line of logic, which the public did not have an opportunity to review and comment on.

The Court acknowledges the many hearings and opportunities for public comment provided by the FWS but finds that the critical deviation in reasoning made in the Final Rule demands an additional period of public review. The Court makes clear that it is not finding here that the FWS's reasoning is unsound or arbitrary and capricious. The error in this case is a procedural one resulting from the FWS failing to provide a period of public review and comment on the Final Rule's critical change in reasoning, however logical that reasoning may ultimately turn out to be.

Based on the foregoing, the Court finds that the FWS failed to provide the public with the requisite opportunity to review and comment on the Final Rule. As such, the Court will remand this matter to the FWS for it to cure the procedural error in regards to affording the necessary public comment period and consider anew the critical habitat designation in light of those comments.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED as follows:

1)     Plaintiffs' Motion for Summary Judgment (Dkt. 38) is **GRANTED IN PART AND DENIED IN PART**.

2)     Defendants' Motions for Summary Judgment (Dkt. 49, 51) are **GRANTED IN PART AND DENIED IN PART**.

3)     The Final Rule is **REMANDED** to the United States Fish and Wildlife Service for proceedings consistent with this opinion.

DATED: **March 23, 2015**

Honorable Edward J. Lodge
U. S. District Judge